[No. 50990–5. En Banc. February 12, 1987.]

VALLEY VIEW INDUSTRIAL PARK, *Respondent,* v. THE CITY OF REDMOND, *Appellant.*

*Ogden, Ogden & Murphy,* by *Larry C. Martin, James E. Haney,* and *Mark A. Eames,* for appellant.

*Bogle & Gates* and *Elaine L. Spencer,* for respondent.

CALLOW, J.—This appeal involves the vested rights doctrine as it pertains to property zoning changes and the question of compensation for damages caused by a zoning change. The property involved is located as shown on the map on page 624.

Valley View Industrial Park is a general partnership formed in 1978 to develop this specific parcel of land. Following a protracted interchange between the partnership and the City of Redmond, within whose boundaries the property lies, the partnership initiated this action against the City seeking (1) a writ of mandamus ordering the City to proceed with site plan review of its light industrial development in the Sammamish River Valley; (2) a declaration that the City's decision to change the zoning of its property from light industrial to agricultural use was an uncompensated taking that violated federal and state constitutions; and (3) damages and attorney's fees it incurred from the time of the zoning change.

The City denied the complaint and interposed the following defenses: (1) that Valley View had failed to meet procedural prerequisites to suit, including (a) conformance with the applicable statute of limitations, (b) exhaustion of administrative remedies, and (c) laches; (2) that the zoning change represented a valid exercise of police power; (3) that even if an unconstitutional taking had occurred, Valley View was not entitled to interim damages and attorney's fees.

The trial court dismissed Valley View's claim for interim damages but conducted a trial to the court on the remain-

FIGURE 6
LAND USE DESIGNATIONS

Ag AGRICULTURE
BP BUSINESS PARK
Bu BUSINESS
Id INDUSTRY
MR MULTIPLE RESIDENCE
Pk PARKS & RECREATION
RE RESIDENTIAL ESTATE
SR SUBURBAN RESIDENCE
UR URBAN RESIDENCE

FUTURE STUDY AREA

ing issues. Following trial, the court found for Valley View. It held that the zoning change was unconstitutional and ordered the City to proceed with the site plan review. The City appealed the decision on the grounds it had asserted

at trial. On Valley View's motion, the case was transferred here from the Court of Appeals pursuant to RAP 4.3.

We affirm the trial court's judgment which holds that Valley View acquired vested rights to have five building permit applications processed under the City of Redmond's light industrial use zoning classification in effect at the time of filing, we affirm the court's order retaining upon the property the light industrial use zoning classification, and we affirm the denial of damages and deny the request for attorney fees in the cross appeal.

## FACTS

Valley View intends to develop an industrial park on a 26.71–acre parcel of property in the Sammamish River Valley. The valley historically was an agricultural area; the soil is some of the richest in King County. In recent years the agricultural character of the Sammamish River Valley has changed drastically. The population has increased significantly. Commercial and residential development has replaced many of the farms and the accompanying agricultural support services, including feed and fertilizer dealers, farm equipment sellers, and grain elevators. The area around the Valley View parcel reflects this transition. The property immediately to the north remains zoned for agricultural uses. To the northwest, across the road from Valley View, are three large industrial developments. Puget Sound Power and Light holds a 250–foot right of way on Valley View's south border. South of that right of way is another industrial park and property zoned for expected commercial and residential development. The Sammamish River marks the east edge of the Valley View property. Across the river, to the southeast, is the site of a proposed regional shopping center.

The City of Redmond annexed the Valley View parcel from King County in 1964, and changed the zoning of the parcel from agricultural to "light industrial." In 1970, the City adopted a comprehensive land use plan setting forth

the City's official policies and goals for future regulation and use of property.

The City began revising and updating its land use regulations to achieve conformity with the 1970 comprehensive plan. Concurrently, the farmlands preservation movement became a force in King County and applied pressure for agricultural zoning of the parcel. In 1977, a citizens' advisory committee was formed for the purpose of formulating recommendations on the land use plan and regulatory revisions. The committee conducted numerous public hearings and meetings, culminating in an official committee proposal which was forwarded to the city council. Following receipt of the proposal, the city council conducted extensive deliberations, including additional public hearings upon the proposal. On June 5, 1979, the council passed ordinance 875, which adopted the City's revised land use goals, policies, plans, regulations and procedures in a volume entitled *Community Development Guide.*

The *Community Development Guide* included an amended zoning map which adjusted the boundary between the agricultural and industrial zones in the Sammamish Valley. The citizen advisory committee recommended that the council shift the boundary between the agricultural and light industrial uses to the south, in alignment with a 250–foot–wide power transmission line right of way, thereby providing a visible and spatial separation of the agricultural and industrial uses. The city council adopted this recommendation as a part of its comprehensive zoning revisions. With adoption of the revised zoning map, the boundary line was extended to the southern boundary of the Valley View property to adjoin the 250–foot power line right of way. The zoning of the Valley View property thus was revised from light industrial to agricultural use.

Valley View formulated and proceeded with plans to develop an industrial park on the tract. Valley View intended the industrial park to consist of 12 buildings, developed in phases. In the first phase, it intended to build the infrastructure (*i.e.,* the road, utilities, etc.) and the shell

of the first building. It then intended to market the project and construct additional buildings as it found tenants for those buildings. The cost of the infrastructure was projected to be so high that the cost would not be recovered, and the project would not be profitable until several of the buildings were completed.

Valley View first initiated contact with the city planning department on September 3, 1978, by submitting a preliminary site plan for the proposed development. A city planner informed Valley View representatives that the proposed industrial park would be subject to site plan review under Redmond ordinance 733, which provided that no building permit could be issued for a commercial or industrial development without prior site plan approval.

Although the preliminary site plan did not contemplate construction that would require a shoreline development permit, the city planner incorrectly informed Valley View that the proposed industrial park would require a shoreline substantial development permit due to the proximity of the Sammamish River.

During the conversation on September 3, Valley View was requested to file, and as a result on September 7, 1978, Valley View did file, a more detailed site plan, a SEPA environmental checklist, a shoreline substantial development permit application and plans for the first of 12 buildings to be constructed in the industrial park. As a result of the discussion on September 3, in which it was informed that the City would require a shoreline substantial development permit, Valley View amended the site plan to include a building which came within 200 feet of the Sammamish River.

On September 7, 1978, the head of the City's building department refused to proceed on the single building permit application until site plan review had been completed on the project.

In a September 18 letter, city officials wrote Valley View for additional information. In response, Valley View provided some information on sewers and storm drainage, as

well as a revised SEPA checklist, a revised site plan and a proposed protective covenant. These documents were filed on October 18.

The City requested no additional information for 3 months. In the interim, it approved a plan to connect the Valley View property to the storm sewer system in place at the industrial park to the south. The City collected $2,500 from Valley View to pay for the extension. On January 22, 1979, the City informed Valley View that an environmental impact statement was necessary.

On February 2, Valley View submitted the names of three consultants to prepare the EIS. The City responded on March 6, by selecting a consultant not on the Valley View list. Attempting to avoid further delay, Valley View sought an appeal of the EIS decision on March 7. The City stated that no appeal was possible, but suggested a modification of the project proposal to obviate the need for an EIS. Valley View submitted a new proposal according to the City's suggested modifications.

In early 1979, Redmond officials informed Valley View that it would have to file additional building permit applications in order to vest its rights to construct the entire project if the City downzoned the property. At that time, the City's site plan review process for the project had not been completed. Valley View then filed four additional building permit applications. The five buildings, for which building permit applications were filed, totaled approximately 108,000 square feet of space out of the 466,914 square feet contemplated by the site plan as a whole. Five was the maximum number of buildings which Valley View concluded it was feasible to build prior to obtaining tenants for them.

On May 22, 1979, Valley View submitted an enlarged site plan and revised protective covenants and offered to negotiate with the City concerning dedication to the City of a buffer zone to the north of the Valley View property. On June 5, 1979, the Redmond City Council enacted the revised zoning code which downzoned the Valley View

property from light industrial to agricultural use. By letter dated June 6, 1979, the City rejected Valley View's modification of its proposal. Valley View did not appeal the development plan rezone as allowed by the Redmond ordinance.

The City's 1976 version of the Uniform Building Code called for building permits to lapse after 180 days unless the permits were renewed for another 180 days. The City notified Valley View in a May 20, 1980 letter that the building permit applications were deemed abandoned. City officials, however, later assured Valley View that it still could proceed under the permits.

After the downzoning, the City took the position that if Valley View agreed to limit development to the five filed building permit applications no EIS would be required. Valley View contended it could not proceed without an EIS. The City agreed to proceed with an EIS, but later reversed itself and refused to proceed. Thereafter, in response to the City's change in position, Valley View filed an application to change the city land use plan and zoning for the property from agricultural to light industrial use. The City then began preparation of an EIS for the Valley View project, and on January 23, 1981, issued a final impact statement for the project. After issuance of the final impact statement, the City refused to further process Valley View's five building permit applications until the city council had acted on Valley View's rezone application.

On April 7, 1981, the city council denied the Valley View rezone request. Valley View did not appeal this decision. Thereafter, the parties engaged in further discussion in which Valley View sought to proceed with a modified proposal. When the City refused to allow Valley View to proceed with the modified development, this suit was commenced on July 10, 1981. We have set forth in the appendix the pertinent trial court findings of fact for two reasons. First, because a number have been challenged, and second, because a reading of those findings is extremely helpful in acquiring an understanding of the factual situation.

## I
### FINDINGS AS VERITIES ON APPEALS

■ The City challenged the trial court's findings of fact. It assigned error to 21 of the findings entered and to the trial court's failure to enter a number of findings the City had submitted but which the trial court rejected. However, in its opening brief the City mentioned only two of the findings to which it had assigned error. Such discussion is inadequate for all except the two mentioned findings. A party abandons assignments of error to findings of fact if it fails to argue them in its brief. *Seattle Sch. Dist. 1 v. State,* 90 Wn.2d 476, 585 P.2d 71 (1978); *Lassila v. Wenatchee,* 89 Wn.2d 804, 809-10, 576 P.2d 54 (1978); *State v. Wood,* 89 Wn.2d 97, 569 P.2d 1148 (1977); *Dickson v. United States Fid. & Guar. Co.,* 77 Wn.2d 785, 787, 466 P.2d 515 (1970). The two remaining findings will not be disturbed if supported by substantial evidence. *Thorndike v. Hesperian Orchards,* 54 Wn.2d 570, 343 P.2d 183 (1959). We find ample evidence on which to premise the two challenged findings and we note that in two findings which we have not recounted, the trial court found that the testimony of the City's witnesses lacked credibility. We have set forth in the appendix the trial court's findings as our recital of the factual situation to accentuate them, to stress the protracted nature of the dealings between the parties and to underscore the establishment of the findings as verities on appeal.

## II
### PROCEDURAL CHALLENGES

The City raises a number of procedural challenges to Valley View's ability to pursue its claim in superior court. In examining these issues, we note that Valley View actually instituted two actions in this case: (1) a petition for a writ of mandamus to order the City to proceed with processing of building applications and site plan review, and (2) a claim for interim damages for an unconstitutional taking without just compensation. The two claims merge

later, but for the discussion of procedural questions, the distinction is important.

## A
### STATUTE OF LIMITATIONS

The first issue is whether the City's statute of limitations for the appeal of a zoning action bars Valley View's claim of an unconstitutional taking.

The city council's enactment of the *Community Development Guide* (hereinafter cited as CDG) changed Valley View's zoning to agricultural use on June 5, 1979. The City's municipal code requires that all appeals of zoning decisions be brought within 30 days. CDG 20F.20.140(10). The City argues that Valley View's failure to appeal within 30 days of the zoning change bars the claim for an unconstitutional taking. We do not agree.

It is well settled in Washington that where a taking occurs by eminent domain or by inverse condemnation, a landowner's right to seek just compensation may not be barred merely by the passage of time. *Petersen v. Port of Seattle,* 94 Wn.2d 479, 483, 618 P.2d 67 (1980); *Highline Sch. Dist. 401 v. Port of Seattle,* 87 Wn.2d 6, 15, 548 P.2d 1085 (1976). In both *Petersen* and *Highline,* we held that the government must prove all the elements of adverse possession including the 10–year prescription period, before a claim for compensation would be barred.

The City argues that the rule from *Petersen* and *Highline* should not apply to takings resulting from police power regulations such as the zoning action in question. We recognize that, unlike eminent domain and inverse condemnation, regulatory takings do not involve actual appropriation of property, and therefore could never meet the elements of adverse possession. Thus, if we applied the *Petersen* rule to a regulatory taking, there would be no time bar whatsoever on a claim for compensation. Moreover, if regulatory takings merit the imposition of damages, the *Petersen* approval would put a premium on letting property owners wait to challenge zoning ordinances until their temporary

damages became impressively large. Williams, Smith, Siemon, Mandelker & Babcock, *White River Junction Manifesto,* 9 Vt. L. Rev. 193, 223 (1984). This prospect is a troubling possibility. However, because under the facts at hand we find the City's 30–day appeal rule inapplicable, we need not reach the issue of what statute of limitations, if any, applies in a regulatory taking.

■ Valley View did not challenge the downzone within the 30 days because it had a good faith belief, based on discussions with city officials, that it had a vested right to develop its industrial park. Finding of fact 34. Had Valley View been allowed to construct its industrial park in accordance with its site plan, it would not have been adversely affected by the downzoning. Finding of fact 39. After the City rejected the modified site plan, Valley View continued to work with the City in an attempt to get its permits issued. City officials continued to assure Valley View that it could still proceed under its permit applications, even after sending notification that the City viewed the applications as abandoned. Valley View continued to exhaust its remedies, filing an application for a rezone from agricultural back to a light industrial designation. It was only after the city council denied the rezone request on April 7, 1981, that Valley View terminated its attempts to work with the City and filed this action. Under this set of facts, Valley View cannot be said to have lost its right to challenge the zoning ordinance simply because it took more than 30 days to seek some accommodation from the City. Valley View does not forgo its right to attack the validity of the zoning ordinance by having sought a variance from its operation. *Lange v. Woodway,* 79 Wn.2d 45, 49–50, 483 P.2d 116 (1971).

B

EXHAUSTION OF ADMINISTRATIVE REMEDIES

The second issue is whether Valley View failed to exhaust its administrative remedies before instituting its action in superior court.

The City argues that Valley View failed to follow statutorily prescribed administrative procedures. The City first alleges that Valley View did not appeal the zoning change to superior court pursuant to CDG 20F.20.140 and the superior court, therefore, lacked jurisdiction to hear the taking claim. Second, the City asserts that Valley View failed to appeal the City's decision to lapse the building permit applications and is thereby prohibited from requesting an order for processing of its permit applications or site plan review. We do not accept either argument.

■ The nature of Valley View's constitutional taking claim rendered the exhaustion requirement inapplicable. First, Valley View's right of appeal was to the superior court, not to an administrative agency. Washington courts distinguish between administrative agency proceedings and "resort to the courts." *See Ackerley Communications, Inc. v. Seattle,* 92 Wn.2d 905, 908–09, 602 P.2d 1177 (1979), *cert. denied,* 449 U.S. 804 (1980); *Wright v. Woodard,* 83 Wn.2d 378, 381, 518 P.2d 718 (1974); *State ex rel. Ass'n of Wash. Indus. v. Johnson,* 56 Wn.2d 407, 410–11, 353 P.2d 881 (1960); *Keller v. Bellingham,* 20 Wn. App. 1, 8, 578 P.2d 881 (1978), *aff'd,* 92 Wn.2d 726, 600 P.2d 1276 (1979). The rationale for the exhaustion requirement is that the administrative officer or agency may possess special expertise necessary to decide the issue, and that an administrative remedy may obviate the need for judicial review. *See, e.g., South Hollywood Hills Citizens Ass'n v. King Cy.,* 101 Wn.2d 68, 73–74, 677 P.2d 114 (1984); *Ackerley,* at 908–09; *Lange v. Woodway,* 79 Wn.2d 45, 48, 483 P.2d 116 (1971). That rationale is irrelevant in this case when the superior court was to provide "administrative" review.

Also unpersuasive is the asserted distinction between the superior court review of the CDG zoning change and the adjudication of Valley View's taking claim. The City presented no evidence or authority that Valley View was required to raise, or could have raised, the constitutional taking issue at the June 9 meeting. Without a record on the constitutional taking issue, the Superior Court had nothing

to review. *Parkridge v. Seattle,* 89 Wn.2d 454, 463–64, 573 P.2d 359 (1978). The City responds that judicial review pursuant only to administrative regulations protects it from defending zoning challenges years later, but that argument raises the statute of limitations which, as stated, is not a defense to the claim that there was an unconstitutional taking.

## C
### DID THE PERMIT APPLICATIONS LAPSE?

■ We also hold for Valley View regarding the building permit application lapse. No exhaustion requirement arises without the issuance of a final, appealable order. *See, e.g.,* RCW 34.04.130; *Bock v. Board of Pilotage Comm'rs,* 91 Wn.2d 94, 99, 586 P.2d 1173 (1978). The City presented no evidence that it had entered a final order that the applications had lapsed and all rights were extinguished. It sent the plaintiffs a letter on May 19, 1980, to that effect, but this letter was not the equivalent of a final order. A letter from an agency will constitute a final order if the letter clearly "fixes a legal relationship as a consummation of the administrative process." Such a letter must be so written as to be clearly understandable as a final determination of rights. *Bock,* at 99. However, doubts as to the finality of such communications must be resolved in favor of the citizen. In *Lee v. Jacobs,* 81 Wn.2d 937, 506 P.2d 308 (1973), a state agency argued that certain letters denying benefits were final orders in a workers' compensation dispute. The court stated:

That is nonsense. If every letter from every agency of state government which arrives on a lawyer's desk must be scrutinized to determine if it contains an appealable order, indeed a burden of considerable magnitude will have been created by fiction.

*Lee,* at 940–41.

In this case, the letter did not fix a clear end to the administrative process. First, the City lacked a clear administrative decisionmaking process regarding building

permit lapses. Moreover, after the letter was sent, City officials twice assured Valley View that it still had vested rights in the buildings. Because of the unclear and inconsistent nature of the permit lapse process, the letter was insufficient to constitute a final order. No exhaustion requirement arose.

## D
### WAS THERE AN ADEQUATE REMEDY AT LAW?

The fourth issue is whether Valley View possessed an adequate remedy at law, which rendered a writ of mandamus inappropriate. The City argues that Valley View could have appealed the lapse of its building permits. The appeal process was a remedy that would have obviated the need for mandamus. As stated, Valley View never received a final, appealable order to appeal. It therefore did not possess an adequate remedy at law.

## E
### LACHES

The final procedural issue is whether Valley View's claim should be barred because of laches.

The City contends that Valley View equitably should be barred from challenging the CDG zoning change. The elements of the doctrine of laches were set forth in *Buell v. Bremerton,* 80 Wn.2d 518, 522, 495 P.2d 1358 (1972) as follows:

(1) knowledge or reasonable opportunity to discover on the part of a potential plaintiff that he has a cause of action against a defendant; (2) an unreasonable delay by the plaintiff in commencing that cause of action; (3) damage to defendant resulting from the unreasonable delay.

The trial judge properly disallowed laches as a defense. Considering all of Valley View's efforts to proceed with the permit application and site plan review, to comply with SEPA requirements, to prepare the EIS statement, and to comply with the request to modify the CDG rezone, it did not delay unreasonably in challenging the City's action.

Valley View sought a declaratory judgment only 3 months after the City had rejected its rezone request. Valley View reasonably waited for the result of its request, which took the City 10 months to process, before it sued in superior court. We reject the City's procedural challenges.

## III
### VESTING

Due process requires governments to treat citizens in a fundamentally fair manner. *West Main Assocs. v. Bellevue,* 106 Wn.2d 47, 51, 720 P.2d 782 (1986). Consequently, citizens must be protected from the fluctuations of legislative policy, *West Main Assocs.,* at 51 (citing *The Federalist No. 44,* at 301 (J. Madison) (J. Cooke ed. 1961)), so that they can plan their conduct with reasonable certainty as to the legal consequences. *West Main Assocs.,* at 51. Property development rights constitute "a valuable property right." *West Main Assocs.,* at 50 (quoting from *Louthan v. King Cy.,* 94 Wn.2d 422, 428, 617 P.2d 977 (1980)). Thus new land use ordinances must satisfy due process standards by meeting a 2–part test: (1) the new regulation must aim at achieving a legitimate public purpose; and (2) the means used to achieve that purpose must be reasonably necessary and not unduly oppressive upon individuals. *West Main Assocs.,* at 52; *Norco Constr., Inc. v. King Cy.,* 97 Wn.2d 680, 684, 649 P.2d 103 (1982).

These due process considerations require that developers be able to take recognized action under fixed rules governing the development of their land. *West Main Assocs.,* at 51. The right of a property owner to use his property under the terms of the zoning ordinance prevailing at the time that he applies for a building permit has been settled for over half a century. *State ex rel. Hardy v. Superior Court,* 155 Wash. 244, 284 P. 93 (1930). The precept was stated in *State ex rel. Ogden v. Bellevue,* 45 Wn.2d 492, 495–96, 275 P.2d 899 (1954), which is often quoted as follows:

A property owner has a vested right to use his property under the terms of the zoning ordinance applicable

thereto. A building or use permit must issue as a matter of right upon compliance with the ordinance. The discretion permissible in zoning matters is that which is exercised in *adopting* the zone classifications with the terms, standards, and requirements pertinent thereto, all of which must be by general ordinance applicable to all persons alike. The acts of administering a zoning ordinance do not go back to the questions of policy and discretion which were settled at the time of the adoption of the ordinance. Administrative authorities are properly concerned with questions of compliance with the ordinance, not with its wisdom. To subject individuals to questions of policy of administrative matters would be unconstitutional. . . .

. . . An owner of property has a vested right to put it to a permissible use as provided for by prevailing zoning ordinances. The right accrues at the time an application for a building permit is made. The moves and countermoves of the parties hereto by way of passing ordinances and bringing actions for injunctions, should and did avail the parties nothing. A zoning ordinance is not retroactive so as to affect rights that have already vested.

(Citations omitted.) We have rejected the rule of many jurisdictions which requires a change of position and a substantial reliance on the building permit before equitable estoppel arises to rescue the by then financially extended landowners. 1 R. Anderson, *Zoning* § 6.24, at 408–09 (2d ed. 1976). *See Hull v. Hunt,* 53 Wn.2d 125, 331 P.2d 856 (1958).

Washington's "date certain vesting rights doctrine" aims at insuring that new land–use ordinances do not unduly oppress development rights, thereby denying a property owner's right to due process under the law. *See West Main Assocs.,* at 50–52. Focusing on the date building permit applications are submitted protects development rights and, at the same time, provides two safeguards against developer speculation: (1) once a permit issues, a time limit is imposed on construction; and (2) preparing the detailed plans and specifications required for the application involves a substantial cost to the developer. *Hull v. Hunt,* at 130. In addition, the permit application date facilitates

determining with certainty what the developer has applied for and what specific rights have accrued as a result. *See Hull v. Hunt, supra* at 130; *see also Mercer Enters. v. Bremerton,* 93 Wn.2d 624, 633, 611 P.2d 1237 (1980) (Utter, C.J., dissenting).

In the ordinary course of events, a developer's right to develop in accordance with a particular zoning designation vests only if the developer files a building permit application that (1) is sufficiently complete, (2) complies with existing zoning ordinances and building codes, and (3) is filed during the effective period of the zoning ordinances under which the developer seeks to develop. *West Main Assocs.,* at 51; *Allenbach v. Tukwila,* 101 Wn.2d 193, 676 P.2d 473 (1984). Due process considerations of fundamental fairness require this court to look beyond these four requirements to the conduct of the parties only in the rare case where city officials clearly frustrate a developer's diligent, good faith efforts to complete the permit application process. *See Mercer Enters. v. Bremerton, supra; Parkridge v. Seattle,* 89 Wn.2d 454, 573 P.2d 359 (1978).

In *Parkridge,* this court created a limited exception to the requirement of completeness of building permit applications. The issue there was whether a right to develop land could vest despite an incomplete building permit application when the developer's diligent attempts to complete the application prior to the zoning change had been obstructed by the local government. This court held that a development right had vested, notwithstanding the incompleteness of the application, because the developer's good faith conduct merits recognition of the vested right. *Parkridge,* at 465–66.

This court then applied the *Parkridge* rule in *Mercer Enterprises* to hold that a developer's building permit application, including a site plan, can be considered as a whole for the purpose of determining whether a building permit complied with the existing zoning ordinances. *Mercer Enterprises,* at 633–34. Although standing alone the building permit exceeded the density restrictions of the

zoning ordinance, when considered together with the site plan for the total development project, the building permit densities were within the density restrictions. The developer's building permit application was held sufficient to establish vested rights in that portion of the project in which building permit applications were filed.

Here, Valley View argues that it has a vested right to build the five buildings covered under the five filed permit applications. In addition, Valley View contends it has a vested right to build the remaining seven buildings designated in the site plan filed with Redmond, but not covered by any permit application. The City argues that the five permit applications were incomplete and therefore insufficient to vest Valley View's rights in those five buildings, much less the seven buildings for which applications were not filed. As to the five buildings covered by incomplete building permits, we conclude that the *Parkridge* rule controls. The trial court's findings clearly demonstrate the presence of each of the *Parkridge* elements: (1) Valley View diligently and in good faith attempted to obtain building permits; (2) Redmond officials explicitly frustrated Valley View's attempts; and (3) as a result, Valley View's building permit applications were incomplete. Thus, Valley View has a vested right to complete the five buildings for which it filed building permit applications under the light industrial zoning classifications.

Whether Valley View's vested right also encompasses the remaining seven buildings is a question of first impression for the court. Like the developer in *Mercer Enterprises,* Valley View proposed a phased construction scenario. Also similar to *Mercer Enterprises,* throughout the negotiations between Valley View and Redmond, the 26.71–acre project was considered as a complete whole. 93 Wn.2d at 628. In *Mercer Enterprises,* however, this court was not asked to determine whether the scope of the vested right encompassed the entire development proposal. As a general principle, we reject any attempt to extend the vested rights doctrine to site plan review. Only where a

city's conduct frustrates the permit application process will we consider looking to the entire development proposal contained in a site plan. Because we have held that Valley View has a vested right to build the five permit application buildings, we consider those buildings as having been constructed, and review the validity of Redmond's downzoning of Valley View's property.

■ To satisfy due process standards, the City's downzoning of Valley View's property decision, like all zoning decisions, must bear a substantial relation to the public welfare. *See Cathcart–Maltby–Clearview Comm'ty Coun. v. Snohomish Cy.*, 96 Wn.2d 201, 211, 634 P.2d 853 (1981). Because Redmond downzoned the property at the specific request of a number of citizens' groups and city officials (finding of fact 50), and because Valley View's property was the only tract downzoned to agricultural zoning (finding of fact 61), Redmond's actions constitute rezoning. *Cathcart,* at 212. Although Redmond's rezoning decision is granted some deference, *Save a Neighborhood Env't v. Seattle,* 101 Wn.2d 280, 285, 676 P.2d 1006 (1984), there is no presumption of validity favoring a rezone. *Parkridge,* at 462. To survive a challenge, the City must demonstrate that the rezoning of Valley View's property bears a substantial relationship to the general welfare of the affected community. *Save a Neighborhood Env't v. Seattle, supra* at 286.

The City argues that rezoning Valley View's property serves two public interests: (1) the preservation of farmland, and (2) the belief that the power line that runs along the south edge of Valley View's property makes a nicer breaking point between land zoned industrial and land zoned agricultural than the north edge of Valley View's property. When viewed in light of the five buildings to be built on the property, the City's rezoning decision bears no relationship to the public interest it seeks to serve, much less a substantial relationship.

Valley View's property is a single tract of land. As the illustrative site map indicates, when Valley View constructs the five buildings covered by permit applications, the

buildings would be so located on the 26.71 acres that its preservation and use as farmland is no longer feasible. In addition, with five buildings already built on the property, the power line no longer provides a break between industrial and agricultural land. The following map illustrates the placement on the site of the five buildings for which building permits have been filed.

VALLEY VIEW INDUSTRIAL PARK

Five buildings plus necessary access roads, parking and utility ingress and egress will so cut up the property that any agricultural use on the remaining portions of the property could well be uneconomic. Furthermore nothing in the record indicates that the right to build just five buildings makes financial sense. The practical result of changing the zoning to agricultural could place Valley View in a situation where economic realities dictate that no buildings will be built. This would deny Valley View its rights which vested upon the filing of the five building permit applications.

As the trial court's findings indicate, Valley View chose the number and location of the buildings covered by permit applications in good faith, basing its decision on a number of factors including: (1) the City would accept five building permits as enough to vest the right to build the entire project (finding of fact 34); (2) the location of the buildings would offer space to prospective tenants with varying needs (finding of fact 33); and (3) five buildings was the maxi-

mum number of buildings which Valley View concluded it was possible to build prior to obtaining tenants (finding of fact 33). Moreover, the rezoning does not bear a substantial relationship to the public welfare in light of the evidence that changes in the Redmond area made Valley View's property extremely undesirable for agricultural use, land to the south and west has been, or rapidly is being, developed for industrial and commercial purposes, and the Valley View parcel does not qualify for the King County Agricultural Lands Preservation Program.

Had the City not explicitly frustrated the building permit process, Valley View would have constructed five buildings ranging over the complete area of its single tract of land. Consequently, the City's subsequent action to downzone would not have withstood scrutiny. Therefore, the City may no longer preclude development of the Valley View property consistent with the code requirements and restrictions pertaining to the light industrial classification in effect at the time the building permit applications were filed.

We hold that when Valley View filed its five building permit applications on the subject property, it fixed, and firmly imprinted upon the parcel, the zoning classification it carried at the moment of the filing. The City has lost its chance to change the zoning classification.

However, "a vested right does not guarantee a developer the ability to build. A vested right merely establishes the ordinances to which a building permit and subsequent development must comply." *West Main Assocs.,* at 53. If the Valley View parcel can contain 12 buildings within its boundaries under the terms of the light industrial classification, the landowner is entitled to construct that number. Valley View is required to file building permit applications for the remaining phases of the project and comply with applicable City ordinances. The City is required to act in good faith in processing Valley View's application.

## IV
### UNCONSTITUTIONAL TAKING

The determination whether a regulation is an unconstitutional taking requires us to consider the type of encumbrance imposed and whether the owner is thereby prevented from making a reasonably profitable use of one's property. *Department of Natural Resources v. Thurston Cy.,* 92 Wn.2d 656, 669, 601 P.2d 494 (1979), *cert. denied,* 449 U.S. 830 (1980). In *Agins v. Tiburon,* 447 U.S. 255, 260, 65 L. Ed. 2d 106, 100 S. Ct. 2138 (1980) the Supreme Court stated that "[t]he application of a general zoning law to particular property effects a taking if the ordinance does not substantially advance legitimate state interests . . . or [if it] denies an owner economically viable use of his land . . ." An otherwise valid zoning ordinance that deprives the owner of the most beneficial use of his property would not be unconstitutional. *Goldblatt v. Hempstead,* 369 U.S. 590, 8 L. Ed. 2d 130, 82 S. Ct. 987 (1962).

We have found, however, that there could be no changing of the zoning classification by the City under the circumstances of this case. Therefore, there could be no unconstitutional taking. Since the property remained zoned light industrial despite the "moves and countermoves" of the City, Valley View has not been deprived of its property. No unconstitutional taking has occurred.

### INTERIM TAKING

Valley View seeks a grant of damages asserting that its property was taken during the interim period of legal jousting between Valley View and the City. Under *San Diego Gas & Elec. Co. v. San Diego,* 450 U.S. 621, 636, 67 L. Ed. 2d 551, 101 S. Ct. 1287 (1981), Justice Brennan would hold that when there is a regulatory taking through zoning action, the constitution demands just compensation. Mere invalidation of the offending zoning ordinance by the government entity is insufficient for it fails to compensate the landowner for the economic loss suffered during the time his property has been subject to a taking. *San Diego,*

at 652–57. *But see Williamson Cy. Regional Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 202, 87 L. Ed. 2d 126, 105 S. Ct. 3108, 3125 (1985) (Stevens, J., concurring).

 Here, however, Valley View has failed to establish a taking through rezoning. The delay which occurred in processing the building permit applications does not justify damages for an interim taking. The five building permit applications were not filed by Valley View until April and May of 1979. The trial court found that the processing of the necessary permits by the City for a project of this nature required a minimum of 4 to 6 months and often several years. Although the City may have frustrated Valley View's efforts to secure five building permits, the delay did not extend beyond a reasonable period for issuance of the permits. This is not the type of action condemned by Justice Brennan in *San Diego Gas & Elec. Co.,* where the zoning ordinance itself effectuates a taking and the municipality has the option of rescinding or otherwise amending its ordinance to eliminate the taking.

### ATTORNEY FEES

Valley View's request for attorney fees pursuant to RCW 8.25.075(3) is premised on a finding that a taking of property without just compensation has occurred. Having reversed the trial court's finding of an unconstitutional taking, no statutory basis exists for an award of attorney fees.

### CONCLUSION

We hold that (1) Valley View has the vested right to have its five building permit applications processed under the light industrial use classification in existence at the time such building permit applications were filed; (2) the entire property must remain zoned as light industrial with the possibility of additional light industrial buildings being constructed on the property subject to compliance with existing city ordinances; (3) no interim taking occurred justifying an award of damages for a temporary taking; and (4) each party shall pay its own attorney fees.

APPENDIX

The trial judge entered findings of fact. The following findings, and each detail thereof, are relevant to our consideration of the issues presented:

4.

The Valley View property is a 26.71 acre parcel of land located in Redmond, Washington. . . . It is bounded on the south by a 250–foot–wide Puget Sound Power and Light right–of–way, on the north by vacant land zoned for agricultural use, and on the east by the King County Sammamish River parkway, a public trail. Immediately west of the Burlington Northern right–of–way is Willows Road.

5.

The Valley View property was annexed by the City of Redmond in 1964 and given light industrial (LI) zoning on December 8, 1964. The zoning on the property remained LI from that time until June 25, 1979. On June 5, 1979, the City of Redmond adopted a new Community Development Guide, which among other things changed the zoning of the Valley View property to agriculture (Ag), effective June 25, 1979.

6.

The property extending north from the Valley View property to the Redmond City limits is zoned for agricultural uses. The property to the south of the Valley View property is zoned for light industrial uses. . . .

7.

Valley View Industrial Park acquired the Valley View property in 1978 for $525,000, or $19,655.56 per acre.

8.

On September 3, 1978, [a Valley View representative] and Valley View's architect . . . met with . . . a planner in the City of Redmond's Planning Department, to discuss the procedures which the City would require for the processing of the permits for Valley View's proposed industrial park. [Valley View's representatives] presented [the planner] with a site plan for the proposed industrial park . . . That proposed site plan contemplated no development within 200 feet of the Sammamish River.

9.

[The planner] informed [Valley View's representatives] that the proposed industrial park would be subject to site plan review under Redmond ordinance 733, which provided that no building permit could be issued for a commercial or industrial development without prior site plan approval. He also informed [Valley View's representatives] that Valley View would be required to obtain a shoreline substantial development permit.

10.

Under the City of Redmond's Shoreline Master Program as it existed

at that time . . . no substantial development permit was required unless a proposal included development within 200 feet of the Sammamish River.

11.

During the conversation on September 3, Valley View was requested to file and as a result on September 7, 1978, Valley View did file with the City a more detailed site plan, a SEPA environmental checklist, a shoreline substantial development permit application, and plans for the first (building A-1) of twelve buildings to be constructed in the industrial park. As a result of the September 3 discussion in which it was informed that the City would require that [sic] a shoreline substantial development permit in any event, Valley View amended the site to include a building which came within 200 feet of the Sammamish River.

12.

Valley View intended to construct the first building as a "shell," and to construct all finish work, including installation of the electrical, mechanical and plumbing systems under separate permits once a tenant had been obtained for the building.

13.

On September 7, 1978, [the] head of the City of Redmond's building department refused to proceed with plan check on the plans which had been submitted for building A-1 until site plan review had been completed on the project. It was not until a few weeks prior to trial that anyone from the City reviewed the plans for building A-1 or the other buildings for which building permit applications were ultimately filed to determine their sufficiency.

14.

On September 18, 1978, [Valley View's architect] received a letter . . . from [the] head of the City of Redmond's Planning Department, and [the] head of the City of Redmond's public works department, requesting a signed application form, a revised SEPA environmental checklist and certain additional information which was required to continue processing of Valley View's applications.

15.

In response to the letter of September 18, 1978, Valley View submitted a signed application form, a revised SEPA environmental checklist . . . a revised site plan . . . a topographic map . . . and proposed protective covenants. . . . The last of these documents was submitted on October 18, 1978. In addition, by September 27, 1978, Valley View's engineer . . . had provided information to the City engineer . . . which satisfied [the engineer] that sanitary sewer service and storm drainage which was satisfactory to the City could be provided for the project from the L.I.D. for the Willows Industrial Center, immediately to the south of the Valley View project. Taken together these submissions complied with the requests in the September 18, 1978, letter from the City, and provided

the City with enough information for it to continue processing Valley View's applications.

16.

Between October 18, 1978, and January 22, 1979, Valley View's representatives made several calls to the City to inquire about the progress of the City's processing of the Valley View applications. The City requested no additional information during that time, but informed Valley View that the press of other matters was responsible for the delay in processing the applications.

17.

By letter dated December 14, 1978, [the Public Works head] approved an extension of the storm sewer line in the Willows Industrial Center L.I.D., to provide storm sewer service to the Valley View project, and requested Valley View to pay the City $2,500 for that extension.

18.

On January 17, 1979, Valley View paid $2,500 to the City for the extension of the storm sewer line, as requested . . .

19.

By letter dated January 22, 1979, the City notified Valley View that an Environmental Impact Statement would be required for the project. The four and a half months between the original filing of Valley View's application and the City's threshold determination under SEPA was the longest period for a SEPA threshold determination for any project considered by the City of Redmond up until that date.

20.

At that time, SEPA threshold determinations were made by [the Planning and Public Works Departments]. In case of disagreement between them, [the head of Planning] made the determination. In Valley View's case, [the head of Public Works] did not believe an EIS should be required because no EIS was required for the Willows Industrial Center, a 48 acre industrial park immediately to the south of the Valley View project. [The head of Planning], on the other hand, concluded that an EIS would be required for the project. At trial, [the head of Planning] testified concerning three potential environmental impacts which caused him to conclude that an environmental impact statement should be prepared for the Valley View project. None of those potential environmental impacts were in fact addressed in the EIS which was ultimately prepared for the Valley View project, however.

21.

The City's letter of January 22, 1979, requested that Valley View submit the names of three potential consultants who could prepare the EIS. On February 2, 1979, Valley View submitted a list of three such consultants.

22.

By letter dated March 6, 1979, the City informed Valley View that [a

consultant] had been selected to prepare the Valley View EIS. [The consultant selected] was not one of the three consultants proposed by Valley View. The City's letter, dated March 6, 1979, further informed Valley View that completion of the EIS would take 18 to 24 weeks.

23.

As of March 6, 1979, the City was actively considering the downzoning of the Valley View property from Light Industrial to Agriculture zoning. The proposal by [the selected consultant] for the Valley View Industrial Park EIS proposed to analyze in that EIS various impacts of the City's proposed change in the zoning and the King County Agricultural Preservation Program which was then under consideration.

24.

On March 7, 1979, Valley View attempted to appeal the SEPA threshold determination for the Valley View project.

25.

By letter dated March 29, 1979, the City informed Valley View that no appeal of the threshold determination was possible. The City suggested, however, that Valley View modify its application so that the affirmative threshold determination could be withdrawn, as provided for by WAC 197–10–370.

26.

As a result of the City's letter of March 29, 1979, a meeting was held in April, 1979, between [the heads of the Planning and Public Works Departments, Valley View's representative] and . . . counsel for Valley View, to discuss what modifications of the proposal the City would suggest which could result in withdrawal of the affirmative SEPA threshold determination. At that meeting, City representatives requested a large scale site plan, and suggested that Valley View provide a buffer between its industrial park and the agricultural land to the north and modify the proposed protective covenants to ensure that the project would not be a truck terminal.

27.

On May 22, 1979, Valley View submitted an enlarged site plan, revised protective covenants which included a provision prohibiting use of the Valley View property as a truck terminal, and an offer to negotiate with the City concerning dedication to the City of a buffer zone to the north of the Valley View property.

28.

By letter dated June 6, 1979, the City rejected Valley View's modification of its proposal as a basis for withdrawal of the affirmative SEPA determination. On June 5, 1979, the Redmond City Council had voted to downzone the Valley View property. The City's files contain an unsigned letter dated May 31, 1979, which is identical to the June 6, 1979, letter except for the date, and which was not sent to Valley View. The City's delay in sending that letter until after the City council's vote on the

downzone is indicative of the City's approach to the processing of Valley View's applications.

29.

In February, 1979, Valley View learned that the City could no longer locate the plans for building A–1 which had been filed in September, 1978. Accordingly, on February 22, 1979, Valley View refiled the plans for building A–1 and a building permit application for building A–1.

30.

Valley View had intended to develop the Valley View Industrial Park in phases. As the first phase, it intended to build the infrastructure (*i.e.,* the road, utilities, etc.) and the shell of building A–1. It then intended to market the project and construct additional buildings as it found tenants for those buildings. The cost of the infrastructure was projected to be so high that the cost would not be recovered, and the project would not be profitable, until several of the buildings were completed. This is typical of a phased project. It was not economically or practically feasible, on the other hand, to build all of the proposed buildings at the outset, before tenants had been found for the buildings.

31.

In early 1979, Redmond officials informed [Valley View representatives] that Valley View would have to file additional building permit applications in order to vest its rights to construct the entire project if the City downzoned the property. At that time the City's site plan review process for the project had not been completed, and the City would not have allowed Valley View to file building permit applications for all of the buildings shown on the site plan.

32.

After discussions between City officials and [Valley View's representative], Valley View filed four additional building permit applications. Building permit applications and plans for buildings L–1, C–1, and D–1 were filed on April 27, 1979. A building permit application and plans for building F were filed on May 11, 1979. The five buildings for which building permit applications were filed totaled approximately 108,000 square feet of space out of the 466,914 square feet contemplated by the site plan as a whole.

33.

The number and location of buildings for which building permit applications were filed was determined based on a number of factors, including that the City would accept five building permit applications, the location of the buildings would offer space to prospective tenants with varying needs, and the fact that five buildings was the maximum number of buildings which Valley View concluded it was feasible to build prior to obtaining tenants for them.

34.

Based on conversations with City officials, Valley View understood

that the filing of the site plan for site plan review and the five building permit applications vested its rights to construct the entire industrial park in accordance with its site plan. Valley View intended to file building permit applications for and construct the remaining buildings shown on the site plan after tenants were found for the first five buildings and as tenants were found for the remaining buildings.

35.

If Valley View is limited to constructing only the five buildings containing 108,000 square feet of space on its 26.71 acre property, it cannot earn a reasonable return on its investment.

36.

The plans and building permit applications submitted for buildings A–1, L–1, C–1, D–1 and F were consistent with the zoning at the time they were filed, and with the 1976 Uniform Building Code and other ordinances then in effect, although additional information would have been required prior to the actual issuance of the building permits.

37.

There is no credible evidence that the City's delays in processing Valley View's permits were caused by the absence of any information which may have to be submitted prior to final issuance of the building permits. To the contrary, the information which was not supplied would not ordinarily be submitted until the City had proceeded further with the processing of the permits than it ever proceeded in this case.

38.

The information submitted by Valley View as of October 18, 1978, satisfied the requirements of Redmond Ordinance 733, the City's site plan review ordinance, for an industrial park such as Valley View was proposing.

39.

Had Valley View been allowed to construct its industrial park in accordance with the site plan filed in September, 1978, it would not have been adversely affected by the downzoning of its property in June, 197[9].

40.

Commencing on July 10, 1979, the parties entered into an extended period of discussions as to how to proceed. Initially, the City took the position that if Valley View agreed to be limited to the five buildings for which permit applications had been filed, it could proceed and no EIS would be required. Valley View, on the other hand, contended that it was entitled to build its entire industrial park in accordance with its site plan, and that it could not proceed with the five buildings without preparing an EIS, except at the risk of later being foreclosed from constructing the remaining buildings by the argument that it had piecemealed the project under SEPA.

41.

Initially, the City agreed to proceed with an EIS. Later the City reversed that position, and refused to proceed with an EIS.

42.

Thereafter, in response to the City's change in position concerning preparation of an EIS, in order to preserve its claim to more than the five buildings, Valley View began a series of meetings with the City in preparation of a rezone application, and on June 20, 1980, Valley View filed an application to change the City land use plan and zoning for the property from Agriculture to Light Industrial. The City then began preparation of an Environmental Impact Statement for the Valley View project and on January 31, 1981, issued a Final Environmental Impact Statement for the project.

43.

After issuance of the Final Environmental Impact Statement, the City refused to further process Valley View's five building permit applications until the city council had acted on Valley View's rezone application.

44.

On April 7, 1981, the Redmond city council refused to rezone the Valley View property from Agriculture to Light Industrial.

45.

Thereafter the parties engaged in some further discussion in which Valley View sought to proceed with a modified proposal. When the City refused to allow Valley View to proceed with the modified development, this suit was commenced on July 10, 1981.

46.

During the period from September, 1978, through June of 1979, the processing of necessary permits by the City of Redmond for a major project requiring site plan review, an environmental impact statement and a shoreline substantial development permit required a minimum of four to six months and often required two to three years. Thus if the City were allowed to treat a building permit as lapsed if the building permit was not issued within 180 days or 360 days from the filing of the application, the City could routinely lapse the building permit applications for any major project simply by its normal handling of site plan review and the environmental statutes applicable to a major project.

47.

In Valley View's case, had Valley View immediately proceeded with an EIS for the project after receiving the City's letter of March 6, 1979, it would have required a minimum of a year from the initial filing of the site plan and shoreline development permit application until its building permits could be issued, and a minimum of more than 180 days from the filing of the building permit application for at least building A–1, if not all five buildings, until a building permit could have been issued.

48.

During the period from September, 1978, until June, 1979, the City required an applicant to complete site plan review for a project prior to the filing of a building permit application. If an applicant filed a building permit application prior to completing site plan review, the City took no steps towards processing of that application until site plan review had been completed.

49.

Under the City's site plan review ordinance, the site plan which is filed and approved binds all future building on the site, as provided by Ordinance 733 . . .

50.

Throughout the period from September, 1978, until the Valley View property was downzoned, there were a number of vocal citizens' groups, members of the City's Policy Advisory Commission and City council members who strongly believed that no development should be allowed on the Valley View property.

51.

Valley View diligently pursued its efforts to develop an industrial park on its property, but the City of Redmond frustrated those efforts.

. . .

53.

With adequate drainage, the soil and climate of the subject property are suitable for growing strawberries, raspberries, blueberries, sod, pasturage and truck farm crops.

54.

Over the last several years, there have been a number of changes in the City of Redmond which have had profound adverse effects on the suitability of the Valley View property for agricultural use and the possibility that anyone could be found who would put that property to a use allowed by the City's Agricultural zoning.

55.

These changes include a significant increase in the population surrounding the property, a concomitant expansion of the urban infrastructure surrounding the property (including a dramatic increase in the square footage of industrial and commercial space in the area, extensive expansion of sewer, water, and natural gas utilities surrounding the property, and expansion and extension of roads in the area), a decline in the agricultural infrastructure necessary to support an agricultural operation (i.e., processing plants, implement dealers, other suppliers, etc.), and a conversion of land in the Sammamish Valley from agricultural use to a fallow condition or non-agricultural use. Each of these changes makes the Valley View property undesirable for agricultural use and

makes it extremely unlikely that anyone would commence an agricultural enterprise on the Valley View property.

56.

Land to the south and west of the Valley View property has been or rapidly is being developed for industrial and commercial uses.

57.

The Valley View property contains prime agricultural soils. This is equally true, however, of property to the south which the City has allowed to be developed with industrial and commercial uses, and property on the east side of the Sammamish River which the City is presently considering rezoning from Agricultural use to allow construction of a major regional shopping center.

58.

The City intends to construct a hiking and biking trail on the Puget Power right-of-way immediately to the south of the Valley View property. If this is accomplished, the entire 3,500 foot southern border of the Valley View property will be exposed to uncontrolled public access. This creates problems of vandalism, theft and attractive nuisance for an agricultural operation on the Valley View property.

59.

The Valley View property is poorly drained, and would require installation of a drainage system for many agricultural uses.

60.

The King County Agricultural Lands Preservation Program is considered to be very important to the continued use of land in the Sammamish Valley for agricultural purposes. The Valley View property does not qualify for inclusion in that program under any priority.

61.

The Valley View property was the only property downzoned to Agriculture zoning from some higher zoning by the adoption of the Redmond Community Development Guide.

62.

None of the present partners in Valley View Industrial Park have any ability to put the Valley View property to any use allowed under the current zoning.

63.

There is no possibility that Valley View can find anyone to put the Valley View property to a use which will allow Valley View to recoup its investment in the property, much less allow it to make a profit.

64.

The downzoning which occurred in June, 1979, destroyed substantially all the value of the Valley View property, and left Valley View with no

reasonable possibility that the property could in fact be put to any use allowed by the zoning.

PEARSON, C.J., and UTTER, BRACHTENBACH, DOLLIVER, ANDERSEN, and DURHAM, JJ., concur.

DORE, J. (dissenting)—The separation of powers doctrine is a cornerstone of American jurisprudence. That which has been left to the Legislature should not be usurped by the judiciary. Unfortunately, the majority opinion, by rezoning the parcel of land owned by Valley View from agricultural to light industry use, does precisely that. Rezoning large parcels of property has always been a legislative, rather than a judicial function, and the majority's refusal to follow this time-honored tradition is incorrect and unconstitutional.

I would hold that Valley View has vested rights in the five buildings for which it has filed building permits, because of the unwarranted interference of the Redmond planning officials in processing such permits. However, Valley View admittedly did not file building permits for the other seven buildings in the site review plan, as it had failed to locate tenants which were essential to obtain financing to justify the preparation and filing of seven additional building permit applications. As the City of Redmond cannot interfere or obstruct the processing of building permits which were never completed or filed, Valley View cannot under our present case law obtain vested rights for these structures. The majority by allowing construction of the seven buildings, which Valley View has yet to file building permits for, overrules the following cases that have previously held that vesting rights can only be established by filing for building permits. *State ex rel. Ogden v. Bellevue*, 45 Wn.2d 492, 275 P.2d 899 (1954); *Hull v. Hunt*, 53 Wn.2d 125, 331 P.2d 856 (1958); *Parkridge v. Seattle*, 89 Wn.2d 454, 573 P.2d 359 (1978); *Mercer Enters. v. Bremerton*, 93 Wn.2d 624, 611 P.2d 1237 (1980); *Norco Constr., Inc. v. King Cy.*, 97 Wn.2d 680, 649 P.2d 103

(1982). I therefore dissent.

### VESTING OF THE FIRST FIVE BUILDING PERMITS

The State of Washington presently has one of the most liberal vested rights doctrines in the nation. The requirements of the Washington doctrine are that (1) the applicant file a building permit application (2) which complies with the existing zoning ordinance and building codes and (3) is filed during the effective period of the zoning ordinances under which the applicant seeks to develop, and (4) is sufficiently complete. *West Main Assocs. v. Bellevue,* 106 Wn.2d 47, 50–51, 720 P.2d 782 (1986). The doctrine in Washington thus provides that an applicant for a building permit has a vested right to have the application processed under the zoning regulations in effect at the time the building permit application is filed.

In contrast to the Washington rule, the majority of jurisdictions hold that even the issuance of a building permit is insufficient to establish a vested right entitling the applicant to a nonconforming use. The applicant, in addition to obtaining a building permit, also must establish a substantial expenditure or change in position in reliance on the issued building permit to effectuate a vested right. *See* 1 R. Anderson, *Zoning* §§ 6.24, 6.25 (2d ed. 1976); Comment, *Washington's Zoning Vested Rights Doctrine,* 57 Wash. L. Rev. 139 (1981).

An applicant in Washington on the other hand need not show a "change in position"; the applicant need only file a sufficiently complete building permit application to vest his right to have his application processed under the existing zoning regulations. *Allenbach v. Tukwila,* 101 Wn.2d 193, 676 P.2d 473 (1984). The rationale for Washington's "date of application" vested rights rule is best enunciated in *Hull v. Hunt,* 53 Wn.2d 125, 130, 331 P.2d 856 (1958) as follows:

> Notwithstanding the weight of authority, we prefer to have a date certain upon which the right vests to construct in accordance with the building permit. We prefer not to adopt a rule which forces the court to search through (to quote from *State ex rel. Ogden v. Bellevue,*

*supra,*) "the moves and countermoves of . . . parties . . . by way of passing ordinances and bringing actions for injunctions"—to which may be added the stalling or acceleration of administrative action in the issuance of permits—to find that date upon which the substantial change of position is made which finally vests the right. The more practical rule to administer, we feel, is that the right vests when the party, property owner or not, applies for his building permit, if that permit is thereafter issued. This rule, of course, assumes that the permit applied for and granted be consistent with the zoning ordinances and building codes in force at the time of application for the permit.

The court concluded that the extensive expense incurred in securing building permits justifies a presumption that developers will not speculate in the enhanced values of land for which building permits have been hurriedly obtained prior to a zoning change. *Hull,* at 130. Thus, Washington's bright line vesting rule presumes the developer has acted in good faith by incurring the substantial costs of filing a complete building permit.

The right to have a complete building permit processed under the zoning ordinances in effect at the time of application is chiefly derived from the doctrine of equitable estoppel and due process concerns of fundamental fairness. Although the court will not scrutinize the moves and countermoves of the parties nor inquire into the extent of expenditure of moneys, the doctrine prohibits a municipality from repudiating its prior conduct when a developer has expended the necessary funds to complete a building permit application. At this stage in the development process, notions of fundamental fairness require that the rules which govern the development be "fixed" and not subject to the "fluctuating policy" of the Legislature. *West Main Assocs.,* at 51.

Filing a complete building permit application is the operative act that converts the developer's mere expectation of no zoning change into the vested right to have the application considered under the existing zoning, despite a

subsequent effective zoning change.

> [T]he right vests when the party, property owner or not, applies for his building permit, if that permit is thereafter issued. This rule, of course, assumes that the permit applied for and granted be consistent with the zoning ordinances and building codes in force at the time of application for the permit.

*Hull,* at 130. *See also Mayer Built Homes, Inc. v. Steilacoom,* 17 Wn. App. 558, 564 P.2d 1170, *review denied,* 89 Wn.2d 1009 (1977). However, the holder of vested rights is not thereby entitled to a building permit or to develop the proposed project, but to have the building permit decision made on the basis of regulations in effect at the time of application. *West Main Assocs.,* at 53.

The requirement that a building permit be sufficiently complete serves two purposes. First, the completed application enables a court to determine whether the building permit application complies with the zoning and building ordinances. *Mercer Enters. v. Bremerton,* 93 Wn.2d 624, 631, 633–34, 611 P.2d 1237 (1980) (Utter, C.J., dissenting). If a building permit application is not substantially complete, the municipality must reject the application and no vested right accrues until the omissions or irregularities are rectified. Second, the completeness requirement ensures that the developer has proceeded in good faith, *i.e.,* incurred an investment sufficient enough to deter speculation. *Hull,* at 130. The provisions of the Uniform Building Code and related standards, 1976 edition, published by the International Conference of Building Officials generally set the requirements a building permit application must conform to in order to obtain a permit approval. *See* former RCW 19.27.030. The nature of a complete building permit application necessarily requires the expenditure of substantial sums of money. *See, e.g., Allenbach v. Tukwila,* 101 Wn.2d 193, 195, 676 P.2d 473 (1984).

Applying the Washington vested rights doctrine, both the majority and I find that (1) Valley View filed five building permit applications (2) which complied with the light

industrial zoning ordinance and building code and (3) were filed during the effective period of the light industrial zoning ordinance under which Valley View sought to construct the five buildings.

The City contends that the fourth element (completeness) is lacking due to the need for additional information in the applications prior to processing. Any incompleteness as to these five building permit applications is governed by the rule of *Parkridge v. Seattle,* 89 Wn.2d 454, 573 P.2d 359 (1978). In *Parkridge,* this court created a limited exception to the requirement of completeness of building permit application. The issue there was whether a right to develop land could vest despite an incomplete building permit application when the developer's diligent attempts to complete the application prior to the zoning change had been obstructed by the local government. This court held that the development right had vested, notwithstanding the incompleteness of the application, because of the municipality's attempts to frustrate the project and the developer's good faith conduct merited recognition of the vested right. *See also Mercer Enters. v. Bremerton,* 93 Wn.2d 624, 611 P.2d 1237 (1980).

Valley View took numerous steps to comply with the City's requests for more information. It modified its plans to conform to city officials' ideas, and showed a willingness to meet necessary shortcomings in the applications. The City, on the other hand, continually made new demands on Valley View. If more detailed building plan information was necessary, the building officer had the power under the ordinance to request it. The trial judge found strict compliance with zoning ordinances. That finding need not be disturbed. Valley View has the right to have its five building permits processed.

THE ADDITIONAL SEVEN BUILDING PERMITS

At this juncture, both the majority and I agree that Valley View has the right to have its five building permits processed under the ordinances in effect prior to the date that

the City of Redmond rezoned its land. At this point, however, the majority ignores clear precedent, and formulates new law without any authority. By rezoning the land as light industrial, the majority violates the doctrine of separation of powers and acts as a legislative body. This should not be allowed, and the City of Redmond undoubtedly will seek relief in the United States Supreme Court.

The majority is correct when it states that a rezone must bear a substantial relationship to the general welfare of the affected community. Majority, at 640; *Save a Neighborhood Env't v. Seattle*, 101 Wn.2d 280, 286, 676 P.2d 1006 (1984); *Save Our Rural Env't v. Snohomish Cy.*, 99 Wn.2d 363, 662 P.2d 816 (1983). The majority, however, for no apparent reason, holds that the Redmond City Council possesses the power and authority to rezone thousands of acres of land from light industrial to agricultural—which of course is correct—but does not have the authority to decide whether to end the rezone at the north end of Valley View's property or at the south end. The majority for some incomprehensible reason holds that the city council's legislative decision where to end a rezone (which they decided to end at a 250–foot power line right of way and not at the point the majority countenances approximately 350 feet north of the power line) bears no substantial relationship to the general welfare of the affected public. Not possessing the majority's omniscient powers of what the general welfare of the affected public is, I would defer to the city council's determination.

The majority creates this situation by looking at Valley View's property as a separate tract of land from the rest of the rezone, and then assuming that the five buildings have been built for which Valley View has filed building permits. Specifically, the majority states: "[w]hen viewed in light of the five buildings to be built on the property, the City's rezoning decision bears no relationship to the public interest it seeks to serve . . ." Majority, at 640. I note that the majority has cited no authority that requires a legislative body, when considering a rezone, to adjust its action to the

possible developments which may or may not occur on the property. This is because no such authority exists.

To the contrary, although the construction of a number of industrial buildings on the parcel may inhibit any agricultural use of the remaining property, it does not follow that the agricultural zoning is invalid. Securing vested rights under a prior zoning classification does not invalidate the subsequently enacted zoning ordinance; the holder of vested rights is merely entitled to a nonconforming use to the extent of the vested rights. 7 P. Rohan, *Zoning* § 52.08[4] (1986); 1 R. Anderson, *Zoning* §§ 6.24, 6.25 (2d ed. 1976); R. Settle, *Washington Land Use* § 2.7(c)(vi) (1983). The remaining land in the parcel is not considered separate from the nonconforming use in a determination as to whether there is a possibility for profitable use of the property.

The logic for this result is apparent. In this case, for example, neither this court nor the Redmond City Council (nor anyone else for that matter) has any idea whether or not Valley View will eventually construct the five buildings for which it has filed permits. The permit applications may be invalid, Valley View may decide to abandon one or more of the buildings, or any number of other events could prevent the construction of those buildings. This is especially true as a building permit does not give the developer a vested right in perpetuity to build, but only a right to build for a limited time period which in the City of Redmond does not exceed 12 months.

The majority's solution to this case does not account for the truly speculative nature of the construction of these buildings. It assumes they have been built, and then makes this legislative decision as an excuse to rezone large tracts of land. Furthermore, it creates the following anomalous situation. Had Valley View proceeded without hindrance from the City of Redmond, and had it found tenants for the other 7 buildings it may have filed and received building permits for all 12 buildings. These would have contained time restrictions and Valley View's vested right to

construct buildings would not have lasted in perpetuity. Instead, because of the delays, Valley View will be given the right to develop its site with no time restrictions and the City will never be able to rezone the land. This makes no sense, yet it is the result the majority opinion provides.

In the subject case, Valley View did not spend any money at all to prepare building permits for the last seven structures. The majority, however, has created a new standard which allows a developer, by filing a few building permits, to prohibit legislative bodies from rezoning adjacent land. This usurps the local legislative power to rezone land according to its beliefs as to the public welfare, and should not be allowed. I would only allow Valley View to have vested rights in the five buildings for which it has filed building permits.

CONCLUSION

I believe the majority opinion commits a flagrant violation of the separation of powers doctrine. Article 2 of the Washington State Constitution and article 1 of the United States Constitution confine the legislative power to the legislatures of the municipal, state and federal governments, and not to the judiciary. Rezoning land thus has always been a legislative act prior to this date, and the majority advances no theory to justify our unilateral decision to change this situation. I believe that the City of Redmond possessed and still possesses the power to rezone the subject tract of land which includes Valley View's property, and that any analysis of what rights Valley View has at this point should be based on our prior decisions concerning vested rights, rather than a wholesale denial of the inherent power of a city to zone land within its own legislative boundaries.

I would

(1) Set aside the trial court's judgment;

(2) Grant Valley View vested rights to five building permit applications, and order the City of Redmond to process such applications in accordance with the zoning

of the City of Redmond in effect at the time the permits were filed;

(3) Valley View, of course, is free to apply to the Redmond City Council for a rezone of the land to permit construction of the additional seven buildings.

GOODLOE, J., concurs with DORE, J.