**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | | |
|---|---|---|
| In the Matter of the Marriage of | ) | No. 79739-5-I |
| | ) | |
| CHANDRA LONG, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| and | ) | |
| | ) | |
| MICHELANGELO BORRELLO, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |
| | ) | |

MANN, C.J. — Michelangelo Borrello appeals the trial court's entry of a parenting plan. Borrello contends that the trial court erred by incorporating the separation agreement signed by Borrello and Chandra Long in 2012 into the parenting plan, and ordering Borrello to pay back child support. Borrello also challenges the trial court's denial of his request to appoint a guardian ad litem (GAL), and contends the trial court violated his due process rights when it denied his motion to appear telephonically. We affirm.

I.

Borrello and Long married in 2008 in San Francisco, California. Together, they have one child, A., who was born in March 2009 in Catania, Italy. Borrello is an Italian

citizen and Long is a United States citizen. Borrello owns a business in Milan but conducts business throughout Europe and his lifestyle requires frequent moves. In the beginning of their marriage, Borrello and Long moved between Catania, Sicily, Diamante, Rome, Germany, and the United Kingdom. Long did not enjoy constantly moving and found this lifestyle especially difficult once A. was born.

In December 2012, the Borrello and Long were legally separated in Italy. The Civil Court of Rome approved their separation agreement. In re Marriage of Long and Borrello, 4 Wn. App. 2d 231, 421 P.3d 989 (2018).[1] The separation agreement set the terms for shared custody of A. Starting the month of September 2014,

> Ms. Long and their child [A.] will be allowed to transfer their residence to the US, specifically in the State of Washington (WA State). Any residence variations of the child will have to be agreed upon in advance by the parents;
>
> [T]he parents will retain shared custody of their child and shared exercise of parental responsibility for anything concerning extraordinary circumstances; ordinary circumstances will be addressed by each parent in the time periods when the daughter will be with that parent.
>
> Mr. Borrello shall continue to submit as maintenance, 600.00 euros for his daughter [A.], in addition to 50% of education, medical and extraordinary expenses as previously agreed;
>
> [T]he father will have the right to visit his daughter every time he will be in USA WA State, with overnight stay in the place where he will reside in such time periods, for a maximum of 15 consecutive days. Mr. Borrello shall provide at least 10-day notice to Ms. Long. Additionally, the father shall have visitation right for at least 16 weeks a year, with exclusive placement of the child with him, outside of the US, with no limitations as to the place or people with whom they will spend such time. For this purpose, Mr. Borrello shall provide at least 15-day notice on such dates to Ms. Long. Additionally, these 16 weeks will follow, to the extent possible, the child's school calendar.

---

[1] The procedural history mirrors the facts summarized in the first appeal.

The separation agreement indicated that when Borrello wanted to exercise visitation, he must travel to the United States and bring A. to Italy and when Borrello's visitation in Italy ended, Long must travel to Italy and bring A. to the United States. The separation agreement also indicated that "the parties agree to confirm the conditions in this agreement in a specific divorce proceeding before the appropriate US Judge."

In September 2013, Long and A. moved from Italy to Everett, Washington. In April 2015, Borrello asked the Civil Court of Rome to modify the separation agreement, claiming that Long prevented him from contacting and forming a relationship with A. The Civil Court of Rome exercised jurisdiction in October 2015.

In November 2015, Long filed a petition for dissolution in Washington. In December, she appealed the Civil Court of Rome's decision to Italy's highest court, the Court of Cassation, challenging its jurisdiction. While the appeal was pending before the Court of Cassation, the Washington proceedings were stayed.

In June 2016, A. returned to Italy for her summer visitation with Borrello. The Civil Court of Rome awarded Borrello temporary sole custody of A. allowing her to live in Italy for the 2016 to 2017 school year, pending the outcome of the Court of Cassation's ruling. In February 2017, the Court of Cassation held that Italy lacked jurisdiction over Borrello's request to modify the parties' separation agreement.

In July 2017, Long asked the Washington trial court to order A.'s return to Washington, to lift the stay on the dissolution proceedings, and to convert the parties' 2012 separation agreement to a decree of dissolution, a permanent parenting plan, and an order of child support. Borrello disagreed and petitioned the Civil Court of Milan to confirm A.'s sole custody with him and continued residence in Italy.

In September 2017, a Washington State superior court commissioner found that Washington had jurisdiction to decide parenting issues involving A. under Washington's Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA). The commissioner lifted the stay on the dissolution proceedings, denied Borrello's motion to dismiss, and refused to order A.'s return to Washington. In October, the superior court granted Long's request to revise the commissioner's decision and ordered A.'s return to Washington State within two weeks. In November, the court denied Borrello's motion for reconsideration.

Borrello asked this court for interlocutory review of the trial court's decision finding jurisdiction under the UCCJEA and ordering the return of A. In December 2017, this court stayed all trial court proceedings and in January 2018, this court granted discretionary review and extended the stays. In July 2018, this court affirmed the trial court's decision.

In August 2018, Borrello filed a petition for review with the Washington Supreme Court and Long moved to lift the stay of the trial court proceedings. Borrello v. Long, 191 Wn.2d 1025 (2018). In October 2018, the Washington Supreme Court denied Borrello's petition for review and lifted the stay of the trial court proceedings. Borrello v. Long, 191 Wn.2d 1025 (2018). As of the trial date in January 2019, Borrello had not returned A. to Washington.

On January 16, 2019, Borrello filed a motion to appear telephonically. On January 24, 2019, the trial court denied his motion, finding that Borrello's claim that traveling to Washington would interfere with A.'s stability and schooling "completely lacking credence" because A.'s "stability and schooling have clearly not been a concern

-4-

to the father." On January 27, 2019, Borrello requested that the trial court appoint a GAL in his trial brief. The trial dates were set for January 28 and 29, 2019. Borrello failed to appear in person. The trial court denied Borrello's request to appoint a GAL, finding that the request had not been properly or timely raised and that the court had:

> sufficient information to make a decision as to a parenting plan which is in the child's best interest without a report from a guardian ad litem, and that any minimal benefit of such report at this point is outweighed by the detriment to the child of further delay in determining a permanent parenting plan.

The trial court heard witnesses from both parties. Laura Bauerlein, Borrello's significant other, testified about A.'s day-to-day life in Italy. Bauerlein has three children of her own from a prior relationship. Since January 2019, Bauerlein has lived with Borrello, A., and her three children in Catania, Italy. Bauerlein testified that Borrello has a very loving relationship with A., that Borrello takes A. to school, and enrolled her in Jiu Jitsu and modern dance at the beginning of January 2019.

The trial court heard from Dr. Federica Maffia, an Italian psychologist, who evaluated Borrello in her capacity as a technical adviser to the Civil Court of Rome. Dr. Maffia did not conduct any "diagnostic tests," however because she did not find that there were any "psychopathologic elements" to render that necessary. Instead, her evaluation consisted of one interview, where she determined that Borrello could "objectively . . . recognize his feelings" and she determined that he was "protective, educational" and his characteristics make him "fit as a parent." Dr. Maffia did not interview A. or witness Borrello's interactions with A. The trial court gave Dr. Maffia's testimony little weight because the interview did not appear to meet psychological standards in the U.S. and "there [was] no indication that [Dr. Maffia] considered, or

perhaps even [knew] about, the chaotic lifestyle the father has subjected the child to or the fact that he was restricting the child's contact with the mother."

The trial court reviewed an e-mail summary from Dr. Erica Volpi, an Italian psychologist and psychotherapist. Dr. Volpi met with A. and her parents on May 16 and 17, 2018 to observe their relationships and report her findings to the Civil Court of Milan. This visit was the first time that Long had seen A. in person since A. left for Italy in 2016. Borrello brought A. to Dr. Volpi's office and on the way, A. asked to buy a present for Long. Long arrived five minutes early and upon being reunited with A., the moment "caused an explosion of irrepressible joy, both from [A.], who did not hesitate to run into her [mother's] arms and hug her very tightly, and the mother [Long] who was visibly moved." Dr. Volpi left A. and Long alone after she did not observe "any negative experience on the part of the child." During that alone time, A. and Long played cards, played with balloons, ate strawberries and candy and Dr. Volpi noted that she "felt moved due to the fact that [Long] had thought about objects and food that could allow them to have a relationship."

Dr. Volpi made the following observations about A. over two visits:

[A.] looked like a happy and talkative child, willing to interact with the undersigned. I chose to observe her without making any particular questions. I limited myself to ask her to describe her parents with three adjectives. She defined her mother as: nice, beautiful and nice. She defined her father as: "sweet", "cute" and bearded. She also added she has "special and unique" parents. I told her that several adults were working to improve the situation of her family relationships but that I wanted to know her thoughts about this, since "I believe the child's opinion is very important". [A.] replied without any hesitation that there is only one important thing: that her parents should stop fighting and become friends.

For both meetings, she asked me how much time she had to be with her mother, feeling really sad by the end of each meeting. She certainly

hoped her mother could stay in Italy for the following days because she knew there was a chance for her mother to change the booking of her flight.

Dr. Volpi made the following observations about Borrello:

A calm man willing to let his daughter meet her mother, though he was very worried because the child's mother could take [A.] away. In my opinion, this was a clearly understandable concern.

He was willing to support all requests from [A.] and I may say he was also willing to support mine! On the first day, he went home before taking the girl to the office and took charge of retrieving a box in which [A.] had kept the presents for her mother. On the second day, he brough a snack, a cake especially bought for [Long] and the girl.

Dr. Volpi made the following observations about Long:

She clearly suffered because she was afraid of not being able to see her daughter. She is a joyful woman who was sincerely moved and touched at the moment she hugged [A.] again.

She was devoted to support the girl while she played. On the second day, she brought a photo album which contained picture she took of [A.] in the United States. A beautiful and significant present the minor child could keep with her.

Dr. Volpi concluded:

I am convinced that the conflict dynamics could just be reduced within a clear setting. A separation by mutual consent that could guarantee the father to reduce his concern for a "disappearance" of the child and that could also guarantee mother and daughter an access in terms of time, which would be a lot more extended and essential for [A.'s] healthy emotional growth.

Unfortunately, in a situation with this complexity, each of them shall give up something, though it is also true that some balance could be identified in light of the proven circumstances (parenting skills).

When comparing Dr. Volpi's observations to Dr. Maffia's testimony, the trial court concluded that Dr. Volpi "did observe the mother and child together, and the father and child together, and had positive things to say about both."

The trial court considered the factors set forth in RCW 26.09.187 in determining the final parenting plan. The court concluded that A. "appears to have a strong relationship with both parents" and "has a close relationship with her father based on the testimony of Ms. Long and Ms. Laura Bauerlein."[2] Further, "despite the mother's limited contact with the child since June of 2016 when the father took the child to Italy, [] the mother has a very strong relationship with the child. That relationship continues to be positive and nurturing and that was confirmed by the testimony of witnesses Laura Bauerlein and Dr. Volpi."

The trial court also made extensive findings about Borrello's and Long's past and potential for future performance of parenting functions:

> The evidence clearly establishes that until the father took the child to Italy in 2016 and failed to return the child, even despite court orders since that time, that the mother clearly took the greater responsibility for performing parenting functions relating to the daily needs for the child. The record also establishes that the mother is the parent with the greater potential, both in the past and in the future, for providing stability and consistency for the child.
>
> The father's life before the mother and child moved to Washington in 2013 was chaotic and constantly changing in terms of where he lived, in term[s] of how he did his work, and the pattern has continued since, particularly during the time that the child has remained with him in Italy and Germany. The most persuasive evidence on this point was Ms. Bauerlein's testimony, but also Ms. Long's. The evidence demonstrates that Mr. Borrello moved the child several times in a two-and-a-half-year period, changing schools each time. In addition, he travels frequently for work, taking the child with him and removing her from school to do so.
>
> Despite [Borrello's] effort to portray his recent move to Catania as establishing stability, it in no way does so. Mr. Borrello and Ms. Bauerlein

---

[2] While Borrello assigns error to all of the trial court's findings under RCW 26.09.187, he has not argued that these findings are not supported by substantial evidence. "A party abandons assignments of error to findings of fact if it fails to argue them in its brief." Valley View Indus. Park v. City of Redmond, 107 Wn.2d 621, 630, 733 P.2d 182 (1987), abrogated on other grounds by Yim v. City of Seattle, 194 Wn.2d 682, 451 P.3d 694 (2019).

moved to Catania in January of 2019. Ms. Bauerlein testified that they had been in Catania for about three weeks at the time of trial. The child has been in her current school for about three weeks at most.

This evidence does not establish stability. To the contrary, it is consistent with the previous and extensive history of frequent moves. It appears to have been to enhance Mr. Borrello's position for the purposes of this trial and is completely unconvincing as establishing a new lifestyle.

Catania was portrayed at trial by [Borrello] as if this was a return to the child's roots because she was born in Catania. While it is true from the evidence that [A.] was born in Catania, the evidence does not suggest that she had a strong attachment to Catania or that being there would be particularly stabilizing for the child.

It is also clear that, in addition to these frequent moves, that these distances between the locations where she has lived are [too] great to maintain the same school, health care providers, or friends. It also must clearly have impact upon her contact with paternal relatives.

The moves have been extensive. [Borrello] has moved the child to Catania, Rome, Milan, and Munich. The child has moved significant distances.

The father provided a report by Dr. Maffia regarding Ms. Long and Mr. Borrello. That report paints the father in a very positive light, and the mother in a much less positive light, claiming that there are issues interfering with her parenting. I find this report and Dr. Maffia's opinion to have essentially no value to the court. The approach that Dr. Maffia took in her assessments of the parents did appear to meet psychological standards in the U.S. Dr. Maffia never observed the father with the child. There is no indication that Dr. [] Maffia considered, or even [knew] about, the chaotic lifestyle the father has subjected the child to or the fact that he was restricting the child's contact with her mother.

Dr. Maffia also never met or spoke with the mother. In the court's [opinion], this renders her opinions about Ms. Long completely useless and highly questionable.

Dr. Volpi on the other hand, observed the mother and child together and the father and child together, and had positive things to say about both.

Ms. Long has demonstrated that she can provide consistency for [A.]. It was clear from her testimony that one of the reasons why the marriage had difficulties is that Ms. Long was tired of trying to raise a child while moving all the time. When [A.] was in Washington with Ms. Long, she

attended the same school for the entire time. She lived in the same house, went to the same health care providers, had the same friends, and interacted with the same people for the entire time. If she returns, she will continue to live in the same [house] and attend the same school as before.

Another factor that weighs very heavily with the court with regard to the past and future potential for performing parenting functions is Mr. Borrello's decision to limit [A.'s] contact with her mother. He has chosen to have her remain in Italy despite knowing that the court's order is enforceable. The Italian courts have indicated that this court's order is to determine what happens. The courts in this state have determined that this court's orders are enforceable and that this court has jurisdiction. [Borrello] has not made arrangements to bring the child here, and frankly gives every indication of having no intention to do so.

He [has] also chosen to limit the mother's contact with the child even when she has gone to Italy to see the child. He has arranged to be gone when [] the mother was there. He has only allowed in-person contact in a therapeutic setting when there is no reason why it cannot be done otherwise. He apparently has limited contact by Skype and FaceTime or telephone at times when he feels that he has been wronged by the court or has other grievances.

This is not consistent with acting in the child's best interest. It is in the child's best interest to have significant contact with both parents. Ms. Long, even now, is prepared to honor the father's right[] to have significant contact with the child.

The trial court concluded that Long demonstrated a commitment to maintaining stability and consistency for A. and nurturing A.'s relationship with Borrello. In the summer of 2013 and 2014, Long brought A. to Italy during Borrello's summer visitation, despite the separation agreement requiring Borrello to travel to Washington to bring A. to Italy. A. spent the summer of 2015 with Long because Borrello was unable to fly due to an issue with his ear and Long was unable to travel because she started a new job as a real estate agent. In 2016, A. traveled to Italy with a round trip ticket scheduled to return to Washington on September 7, 2016, but Borrello never returned her to the United States.

While Borrello had custody of A. in Italy, he made it difficult for Long to see A. Long travelled to Italy for a court hearing and requested to see A. for three nights, but Borrello travelled with A. to Germany. The Civil Court of Milan ordered Borrello to return to Italy, allow Long visitation time, and pay for Long to stay an extra week in Italy while she waited for Borrello to return from Germany. Long only had one physical visit with A. while [A.] was living in Italy and it was during a court ordered visitation at Dr. Volpi's office. Long unsuccessfully tried to exercise visitation rights every month that A. was in Italy. Otherwise, Long maintained contact through almost daily phone calls, unless Borrello turned off A.'s phone, which he did when court orders were granted in Long's favor.

In assessing A.'s relationship with siblings and other significant adults and A.'s involvement with her physical surroundings, school, and other significant activities the court found:

> through the living arrangement with Ms. Bauerlein, [A.] has sort of surrogate siblings. It appears that she has a good relationship with those three children. It is relatively new. [A.] has grandparents and extended family members in both Italy and Washington. There's obviously been some contact with Mr. Borrello's extended family, although at present it appears to be limited to some aunts and uncles. The impression this court had was there was not a close relationship or a frequent relationship with those persons as yet. That contact would be interrupted if the child returned to Washington, but the parenting plan proposed by mother would allow the child a great deal of time in Italy in order to [maintain] those contacts or develop them.
>
> The mother has shown a commitment to maintaining contacts with both families by encouraging the father to exercise his residential time and taking the child to Italy to do so.
>
> The child does not have a significant relationship to physical surrounding[s], school, or other activities in Italy as they have been constantly changing. She has only been in her current home and

-11-

community for a little over a month at the time of entry of this order. In Washington, the child would be in the same community, same school, and with the same care providers. She would have contact with extended family as she was before being taken to Italy by her father, and there is every reason to believe that that would continue for the indefinite future.

From 2012 to 2016, while A. was living in Washington, she was enrolled in swimming lessons at the YMCA, acting classes at the Village Theater for Kids, and ballet.

The trial court noted that Long's work schedule provided more consistency and stability for A. because Long works in the community and does not travel extensively, while Borrello's schedule creates less consistency, involves much travel, and causes disruptions to A.'s schooling and schedule. All factors the trial court considered weighed in favor of Long. Borrello appeals.

## II.

We review parenting plans for abuse of discretion. In re Marriage of Katare, 175 Wn.2d 23, 35, 283, P.3d 546 (2012). A trial court abuses its discretion only if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons. Katare, 175 Wn.2d at 35.

Findings of fact are verities on appeal, so long as they are supported by substantial evidence in the record. Katare, 175 Wn.2d at 33. Evidence is substantial when it persuades a fair-minded person of the truth of the matter asserted. In re Marriage of Black, 188 Wn.2d 114, 127, 392 P.3d 1041 (2017). We do not review the trial court's credibility determinations or weigh conflicting evidence. Black, 188 Wn.2d at 127. If there is substantial evidence supporting the finding, it does not matter that other evidence may contradict it. Black, 188 Wn.2d at 127.

## A.

-12-

Borrello contends that the trial court erred by denying his request to appoint a GAL to independently evaluate A. We disagree.

Appointment of a GAL is within the trial court's discretion and therefore, we review it for abuse of discretion. Wildermuth v. Wildermuth, 14 Wn. App. 442, 446, 542 P.2d 463 (1975). "The court may order an investigation and report concerning parenting arrangements for the child, or may appoint a guardian ad litem pursuant to RCW 26.12.175, or both." RCW 26.09.220(1)(a). "The court may appoint a guardian ad litem to represent the interests of a minor or dependent child when the court believes the appointment of a guardian ad litem is necessary to protect the best interests of the child in any proceeding under this chapter." RCW 26.12.175(1)(a).

Borrello requested that the trial court appoint a GAL in his trial brief filed on January 27, 2019. The court held the trial on January 28th and 29th. In Borrello's trial brief, he requested "a Guardian ad Litem to address the issues of residential placement as well as the issues brought forth by the Italian courts pertaining to [Long's] inability to effectuate parenting and a relationship between father and child." The court concluded that Borrello's request was not timely because the stay had been lifted since October 2018 and Borrello raised the issue in his trial brief, rather than a formal motion requesting appointment. In denying Borrello's request, the court concluded it had sufficient information to determine what was in the best interest of A. and that further delay in determining a permanent parenting plan outweighed the minimal benefit of such a report.

In the final parenting plan, the trial court:

decline[d] the appointment of a Guardian ad Litem. This matter has been pending since November 13, 2015. The issue of appointing a Guardian ad Litem was reserved in the court's order of October 10, 2017. Mr. Borrello did not raise the issue of appointment of a Guardian ad Litem until the date of trial on January 28, 2019. No formal motion has ever been made at this point for appointment of a Guardian ad Litem. The Court concludes that this request has not been properly or timely raised.

Borrello cites In re Marriage of Waggener, 13 Wn. App. 911, 915 538 P.2d 845 (1975) to support his argument that the trial court committed reversible error by failing to appoint a GAL where the record was not adequately developed regarding recent developments in the case. Waggener is distinguishable. In Waggener, the court identified several deficiencies in the record about the child's relationship with both parents. 13 Wn. App. at 916. Further, neither parent identified how they would balance caring for their child with their careers; the father was a United States Air Force Pilot stationed in Hawaii and his military career subjected him to frequent transfers and flights away from home, while the mother lived in Washington and was pursuing a law degree. Waggener, 13 Wn. App. at 916.

The final decree ordered the child to live with his father and his prospective stepmother, despite the record lacking information about the child's relationship with his prospective stepmother. Waggener. 13 Wn. App. at 913. After the court entered the final order, the mother filed a petition to modify the decree, supported by a lengthy affidavit of a child psychologist, who examined the child and concluded he was experiencing severe emotional difficulties in his environment and should be returned to the mother's custody. Waggener, 13 Wn. App. at 914. The court reversed because there was new information showing that the placement was not in the child's best

interest and the record had many deficiencies relating to the parents' relationship with the child and their respective parenting capabilities.

Here, Borrello contends that A.'s life has changed significantly since she has been living in Italy and therefore a GAL is necessary to "provide an important, independent perspective on [A.'s] development in the three years prior to trial as well as her connection to her father and country of birth." Borrello contends that the trial court ignored his witnesses who testified that A. was a good student and enrolled in extracurricular activities, that it is not strange for children in Italy to change schools, and that A. had formed important relationships in Italy. From this argument, Borrello contends that a GAL was necessary because of "the distance and cultural divide between the witnesses and court hearing the case in Washington who could only speculate on the child's <u>current</u> life in Italy."

Borrello's argument has little merit. In <u>Waggener</u>, the record was inadequate in the type of relationship that the child had with his parents, how the parents planned to balance their careers and parental duties, and which placement would be in the child's best interest. Further, the mother filed an affidavit from a child psychologist who, after two examinations "concluded that the child was experiencing severe emotional difficulties in his present environment and should be returned to [the mother's] custody." <u>Waggener</u>, 13 Wn. App. at 914.

Here, Borrello presented evidence about A.'s life in Italy. Bauerlein, Borrello's significant other who had recently moved in with Borrello, testified about A.'s day-to-day life in Catania. Although the trial court found Bauerlein's testimony credible, the trial court was not convinced that Borrello would stay in Catania long term because,

-15-

historically, he frequently moved between cities and countries for work. Borrello and Bauerlein began living in Catania only three weeks before the trial and the court did not find Borrello's statement credible that he would live in Catania long term.[3]

Furthermore, Long presented evidence that she and A. had a very strong bond, despite living apart for several years. Long maintained her strong bond with A. by talking through Skype and FaceTime.[4] The court concluded that the parenting plan proposed by Long, which was in accordance with the separation agreement, was in the best interest of A. "because it provides [A.] with stability and consistency and allows [A.] the opportunity to have a positive and meaningful relationship with both parents." The court found that Borrello's schedule, "which involved much travel, which he now takes [A.] on, causing disruption to her schooling and her schedule, creates much less consistency for her." Further, Borrello prevented Long from seeing A. since 2016 despite the terms in the separation agreement and the temporary Italian court orders providing that Long could "see [A.] when she wishes to, when she is in Italy, provided

_____

[3] Specifically, the trial court found:

Despite [Mr. Borrello's] effort to portray his recent move to Catania as establishing stability, it in no way does so. Mr. Borrello and Ms. Bauerlein moved to Catania in January of 2019. Ms. Bauerlein testified that they had been in Catania for about three weeks at the time of the trial. The child has been in her current school for about three weeks at most.

This evidence does not establish stability. To the contrary, it is consistent with the previous and extensive history of frequent moves. It appears to have been to enhance Mr. Borrello's position for the purposes of this trial and is completely unconvincing as establishing a new lifestyle.

Catania was portrayed at trial by the respondent as if this was a return to the child's roots because she was born in Catania. While it is true from the evidence that [A.] was born in Catania, the evidence does not suggest that she had a strong attachment to Catania or that being there would be particularly stabilizing for the child.

[4] Bauerlein also testified that she believed Long interacted with A. in a loving manner.

she gives 15 days' notice and keeps her with her in Catania for three consecutive days." The record was adequately developed as to the difference in living situations between Long and Borrello. Borrello cannot show that the trial court abused its discretion.[5]

B.

Next, Borrello contends that the trial court abused its discretion when it entered the parenting plan because it relied on "outdated information" in the separation agreement. We disagree.

Borrello makes this argument without citing any legal authority that the separation agreement is unenforceable. Indeed, Borrello sought to modify the separation agreement, contending that "the [parties'] wishes had changed significantly." But, it is presumptuous that Borrello represents to this court that he speaks for himself and Long, because Long expressed a clear desire that the parenting plan comport with the separation agreement. Further, Borrello fails to cite anything in the record to indicate that Long's wishes had changed.

In his briefing, Borrello argues at length about why the separation agreement is "outdated" and the trial court's reliance on the agreement was a reliance on "outdated information." These conclusory statements are not supported by the record. The trial court heard from all of the parties' witnesses, with the exception of Borrello because he chose not to appear, and reviewed documentary evidence presented by both parties in addition to evaluating whether the separation agreement was in A.'s best interest before

---

[5] Borrello contends that the trial court erred when it denied his request for a GAL because it was untimely. We decline to address this alternative argument because Borrello cannot show that the record relied upon by the trial court was inadequately developed. We also decline to address Borrello's contention that the issue of appointing a GAL was reserved by an order of the court on October 10, 2017 for the same reasons.

entering the parenting plan. The evidence considered spanned A.'s lifetime. The trial court made detailed and specific findings under RCW 26.09.187. As the trial court noted, Borrello did not argue or present evidence supporting any basis for repudiating the separation agreement.[6] Furthermore, the trial court found that the separation agreement was:

> quite impressive, in terms of what the parties agreed to, was that it really did give this child the opportunity to have a close relationship with both parents, and a real opportunity to know and love both countries, to have a lot time with families in both countries, and to be in the fairly unique position of really having much more of a world view and understanding of different cultures than she would have just living primarily in one or the other.

The trial court did not abuse its discretion by incorporating the separation agreement into the parenting plan.

C.

Borrello contends that the trial court committed reversible error by restricting his time with A. for reasons unsupported by the record. We disagree because there are no .191 restrictions in the parenting plan.

The trial court has discretion to determine whether the evidence presented met the requirements of RCW 26.09.191. <u>Caven v. Caven</u>, 136 Wn.2d 800, 808, 966 P.2d 1247 (1998). RCW 26.09.191(3) provides:

> A parent's involvement or conduct may have an adverse effect on the child's best interests, and the court may preclude or limit any provisions of the parenting plan, if any of the following factors exist:
>
> . . . .

---

[6] The trial court noted that "no one has really attempted to repudiate or suggest that it was the product of fraud or coercion."

(e) The abusive use of conflict by the parent which creates the danger of serious damage to the child's psychological development;

(f) A parent has withheld from the other parent access to the child for a protracted period without good cause.

Here, the trial court made the following findings under RCW 26.09.191(3)

The court is also required to consider the issue of restrictions. There is a basis for restrictions on the father under RCW 26.09.191(3)(e) for abusive use of conflict. That has clearly happened due to the father's taking the child to Italy, refusal to return, and his limitation of contact between the child and [Long].

There is also a basis for restrictions under RCW 26.09.191(3)(f) for withholding from the other parent access to the child for a protracted [time period and Long] should have contact with the child. There is no safety issue with this mother having contact with the child.

The court is concerned about [Borrello's] willingness to abide by any parenting plan. His behavior would be sufficient to justify entry of a more restrictive parenting plan to guard against this. However, [Long] is not seeking a more restrictive plan at this time.

In the final parenting plan under the section on "reasons for putting limitations on a parent (under RCW 26.09.191)," the court indicated the section does not apply to the parenting plan. [7] Instead, the trial court noted it had a basis to order .191 restrictions under the statute, but ultimately, it did not order any restrictions. Borrello has failed to show the trial court abused its discretion.

Borrello analogizes to Katare, contending that the parenting plan:

(1) moves the child across the globe, approximately 5,600 miles away from her home country and her father; (2) mandates that Long be the 'primary parent of the child;' and (3) limits the father's visitation in his

---

[7] The other cases cited by Borrello to support his argument discuss specific .191 restrictions in the parenting plan, which have not been ordered here. See, e.g., In re Marriage of Chandola, 180 Wn.2d 632, 653, 327 P.3d 644 (2014) (reviewing a .191 restriction on paternal grandparent's presence for no more than 20 percent of the father's residential time with the child); In re Marriage of McNaught, 189 Wn. App. 545, 563, 359 P.3d 811 (2015) (reviewing a .191 restriction where the father could not designate other caretakers).

country 'up to 16 weeks' per year without <u>any minimum amounts of visitation</u> that the father is entitled to exercise under the plan.

<u>Katare</u> is distinguishable simply because the court entered .191 restrictions, which are absent here. There, the trial court stated the following in its oral decision:

> I'm not persuaded, based on all the evidence presented . . . that Mr. Katare presents a serious threat of abducting the children. Nonetheless, if I'm wrong on this the consequences are incredibly serious and I'm mindful about that. I'm going to impose some restrictions in the parenting plan that will be designed to address this issue, and I hope that everything that has been brought to this Court, which I think indicates that there is not a serious risk of abduction, turns out to be the truth.

<u>Katare</u>, 175 Wn.2d at 31. The court imposed the following .191 restrictions: (1) prohibited the father from taking the children out of the country until they turned 18, (2) denied the father access to the children's passports or birth certificates, and (3) required the father to surrender his passport to a neutral party during visitation periods. <u>Katare</u>, 175 Wn.2d at 31. Borrello has not identified any similar restrictions on his time with A.

Finally, Borrello contends that the parenting plan does not provide him with a guaranteed minimum amount of time with A. Borrello has not provided authority to support his proposition that the court must provide him with a minimum number of guaranteed visitation weeks. The parenting plan indicates:

> The child shall reside primarily with the mother in the United States. The child will reside with the father as follows:
>
> In Washington: The father shall have <u>liberal visitation rights</u> with the child every time he will be in Washington State. Father may have overnight visitation during these visits in Washington for up to 15 consecutive days at a time.
>
> Father must provide Mother at least 10 days' notice of his intent to exercise visitation with the child and the visitation will follow the school calendar as much as possible and shall not unduly interfere with the child's attendance at regularly scheduled school and extracurricular

activities. The Father shall provide the Mother with written verification of his itinerary, including his flight schedule, the place he intends to stay and a phone number where he can be reached during his residential time.

Outside Washington: Additionally, the Father may exercise up to 16 weeks of residential time outside of the State of Washington. Father shall have 8 of his 16 weeks of out-of-state visitation during July and August, up to 4 weeks during the winter holidays (including the New Years on alternate years) and up to 4 weeks during the spring.

Father must provide Mother at least 15 days' advance notice of his intent to exercise this out-of-state visitation with the child and the visitations will follow the school calendar as much as possible and shall not unduly interfere with the child's attendance at regularly scheduled school and extracurricular activities.

(Emphasis added). The parenting plan clearly explains how Borrello can exercise visitation, providing up to 16 weeks of visitation in Italy and additional visitation time in Washington.

Borrello has failed to show that the trial court imposed a .191 restriction on his time with A. or abused its discretion in the parenting time schedule.

D.

Borrello contends that the trial court violated his due process rights when it did not allow him to testify remotely. We disagree.

The decision to allow telephonic testimony lies within the trial court's discretion. CR 43(a). CR 43(a)(1) provides the trial court with discretion to determine whether a party has shown "good cause in compelling circumstances" and "involves a fact-specific inquiry that rests in the sound discretion of the trial court." In re Marriage of Swaka, 179 Wn. App. 549, 556, 319 P.3d 69 (2014). "[G]ood cause and compelling circumstances are likely to arise when a witness is unable to attend trial for unexpected reasons, such

as accident or illness, but remains able to testify from a different place." Swaka, 179 Wn. App. at 554.

CR 43 was modeled off Rule 43 of the Federal Rules of Civil Procedure (FRCP) and the "the drafters of the 2010 amendment [to CR 43(a)(1)] intended that Washington courts seek guidance from the 1996 advisory committee notes to FRCP 43 when interpreting [CR 43(a)(1)]." Swaka, 179 Wn. App. at 554 (citing Wash. St. Reg. 10-05-090). The advisory committee's notes provide:

> Contemporaneous transmission of testimony from a different location is permitted only on showing good cause in compelling circumstances. The importance of presenting live testimony in court cannot be forgotten. The very ceremony of trial and the presence of the factfinder may exert a powerful force for truthtelling. The opportunity to judge the demeanor of a witness face-to-face is accorded great value in our tradition. Transmission cannot be justified merely by showing that it is inconvenient for the witness to attend the trial.

FRCP 43 advisory committee's notes to 1996 amendments.

The trial court did not find good cause to grant Borrello's motion, stating:

> The father did not personally appear for trial and claimed he was unable to travel to Washington because it would interfere with the child's stability and schooling. These claims are completely lacking credence in light of the credible testimony by both Ms. Long and Ms. Bauerlein and the complete lack of consistency with regard to this child's residence and school attendance. These claims are clearly manufactured. The child's stability and schooling have clearly not been a concern to the father and for him to use that as a reason not to come here is simply not credible. The father has been to this state before and travels frequently for business. There is no convincing reason why he could not have attended this trial in person if he wished to do so.

"The essence of due process is the requirement that 'a person in jeopardy of serious loss (be given) notice of the case against him and opportunity to meet it.'" Mathews v. Elridge, 424 U.S. 319, 348, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976). Further,

"[a]ll that is necessary is that the procedures be tailored, in light of the decision to be made, to 'the capacities and circumstances of those who are to be heard.'" Mathews, 424 U.S. at 349. Borrello was given the opportunity to appear in person after the trial court denied his motion. By failing to appear, Borrello waived his rights.[8]

Finally, Borrello consented to jurisdiction in the separation agreement. The terms of the agreement provide, "[l]astly, the parties expressly agree to confirm the conditions contained in this agreement in a specific divorce proceeding before the appropriate US Judge." Borrello has not challenged the enforceability of the agreement.

The trial court did not abuse its discretion by denying his motion to appear telephonically.[9]

III.

Borrello next challenges the trial court's finding that Long was entitled to file a motion for attorney fees.

"Three requirements compose a claim fit for judicial determination: if the issues raised are primarily legal, do not require further factual development, and the challenged action is final." State v. Bahl, 164 Wn.2d 739, 751, 193 P.3d 678 (2008) (quoting First United Methodist Church v. Hr'g Exam'r for Seattle Landmarks Pres. Bd., 129 Wn.2d 238, 255-56, 916 P.2d 374 (1996)). If these three requirements are not met, then the issue is not ripe for review. Bahl, 164 Wn.2d at 751. "The court must also

---

[8] Borrello cites Aiken v. Aiken, 187 Wn.2d 491, 387 P.3d 680 (2017), to support his contention that the trial court violated his due process right. The constitutional right implicated in Aiken was the father's fundamental liberty interest in making decisions regarding his daughter's care, custody, and control, which, under a one-year protection order, deprived him of his liberty interest. Here, Borrello has not been denied any similar rights, instead, he shares these rights with Long.

[9] Borrello does not argue that he satisfied the good cause requirement in CR 43(a); thus, we decline to address whether the court erred when it found he did not show good cause to support his motion.

consider the hardship of the parties of withholding court consideration." Bahl, 164 Wn.2d at 751 (internal quotation marks omitted).

In the trial court's findings and conclusions, it noted that Borrello "should be ordered to pay toward [Long's] fees and costs incurred in Washington State. The court will convene a separate hearing to determine the fees and costs to be awarded." Specifically, Borrello takes issue with the trial court's oral ruling that "it is appropriate to award some fees to [Long] based on [Borrello's] intransigence with regard to the parenting plan and failure to honor his own agreement." Borrello contends that he "abided by valid court orders regarding the child's presence in Italy until a final decision could be rendered" and therefore the trial court's finding that he was intransigent was not supported by the record.

There is no attorney fee award before this court, therefore the challenged action is not final and not ripe for review. If Long seeks attorney fees and the trial court grants her request, then Borrello can appeal the trial court's order.

IV.

Borrello contends that the trial court erred in awarding $20,340 in past due child support to Long for June 2016 to November 2018 because A. lived with Borrello in Italy for that time period. We disagree.

We review child support orders for an abuse of discretion. In re Marriage of Griffin, 114 Wn.2d 772, 776, 791 P.2d 519 (1990). Substantial evidence must support the trial court's factual findings. In re Parentage of Goude, 152 Wn. App. 784, 790, 219 P.3d 717 (2009).

Child support is set by statute with the support obligation divided proportionately to the parents' respective income levels. RCW 26.19.001, .080(1). The statutes allow the trial court to deviate from the standard schedule and provides a nonexclusive list for reasons to deviate. RCW 26.19.075. RCW 26.09.070(3) provides that a separation contract's terms:

> shall be binding upon the court unless it finds, after considering the economic circumstances of the parties and any other relevant evidence produced by the parties on their own motion or on request of the court, that the separation contract was unfair at the time of its execution. Child support may be included in the separation contract and shall be reviewed in the subsequent proceeding for compliance with RCW 26.19.020.

The separation agreement states that starting the month of September 2014, "Mr. Borrello shall continue to submit maintenance, 600.00 euros for his daughter [A.], in addition to 50% of education, medical, and extraordinary expenses as previously agreed." In a temporary order from the Civil Court of Rome, Long was ordered to pay Borrello "150,00 euros a month and 50% of any extraordinary expenses mutually agreed upon, except for urgent health costs."[10] The temporary custody order was in effect from October 11, 2016 until the Court of Cassation determined the jurisdictional issues in the case.

Borrello contends that the temporary custody order from the Civil Court of Rome suspended his requirement to pay Long child support. The Civil Court of Rome order contains no such suspension. Borrello cites Hartman v. Smith, 100 Wn.2d 766, 674

---

[10] Long admitted that she did not pay Borrello 150 euros a month under the temporary order and the trial court did not offset Borrello's back support obligation with Long's obligation. While Borrello's briefing argues that the Civil Court of Rome's temporary order suspended his obligation in the separation agreement, he does not argue that he is entitled to an offset or back support from Long and therefore we do not address whether the Civil Court of Rome order was enforceable against Long.

P.2d 176 (1984), to support his contention that while A. resided in Italy, he did not have to pay Long child support because he was the primary parent.

In Hartman, the court applied equitable estoppel to bar the mother from seeking back child support. 100 Wn.2d at 766. The mother remarried and her new spouse adopted the child. Hartman, 100 Wn.2d at 766. Later, the adoption was deemed void and the father began paying child support again. Hartman, 100 Wn.2d at 767. The mother sought back support and the court concluded that that the father did not owe back support because during the period of the presumptive adoption, the mother represented to the father that he no longer had a duty to provide support. Hartman, 100 Wn.2d at 769.

Hartman is not analogous. First, Borrello is not arguing that equitable estoppel applies in this case. Instead, Borrello sought to modify the separation agreement in the Civil Court of Rome, but the Court of Cassation ultimately found that it did not have jurisdiction to make the modification. Thus, the separation agreement remained operable until the dissolution was finalized in Washington and the court reviewed the separation contract for compliance with RCW 26.19.020.[11] Throughout Borrello's briefing, he continually refers to the separation agreement as "outdated," but nothing in the separation agreement indicates that it expires before A. turns 18. We decline to accept Borrello's contention that the separation agreement is outdated and that he does not owe back child support. The trial court did not abuse its discretion when it determined Borrello was obligated to pay back support under the separation agreement.

_____

[11] Borrello has not challenged the trial court's prospective order that he must pay Long 600 euros per month and that the separation agreement provided a basis to deviate from the standard calculation of $474.58.

No. 79739-5-I/27

We affirm.

_Mann, C.J._

WE CONCUR:

_Chun, J._          _Leach, J._

-27-