

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In re the Parental Rights to: | ) | No. 38924-3-III |
| | ) | (consolidated with |
| D.G.B.† | ) | No. 38925-1-III) |
| | ) | |
| Minor Child. | ) | UNPUBLISHED OPINION |
| In re the Parental Rights to: | ) | |
| | ) | |
| B.D.B. | ) | |
| | ) | |
| Minor Child. | ) | |

LAWRENCE-BERREY, J. — J.A., mother to D.G.B. and B.D.B., appeals the

termination of her parental rights. She argues the Department of Children, Youth, and

Families (Department) failed to offer necessary services capable of correcting her

parental deficiencies, specifically, inpatient dual diagnosis treatment to address her

substance abuse and mental health issues. The record refutes her argument, so we affirm.

---

† To protect the privacy interests of D.G.B. and B.D.B, we use their initials
throughout this opinion. Gen. Order for Ct. of Appeals, *In re Changes to Case Title*
(Wash. Ct. App. Aug. 22, 2018, (effective Sept. 1, 2018), http://www.courts.wa.gov/
appellate_trial_courts).

FACTS

J.A. is the single mother of five children. Her parental rights to three of her children were previously terminated. This appeal concerns the termination of J.A.'s parental rights to D.G.B., born in May 2016, and B.D.B, born in March 2019. D.B. is the presumed father of D.G.B. and the alleged father of B.D.B. D.B. died in May 2020, during the pendency of the underlying dependency actions.

D.G.B. was born in Yakima in 2016. While J.A. was pregnant with D.G.B., she used marijuana and methamphetamine. After his birth, Child Protective Services (CPS) investigated J.A.'s substance use and the reported domestic violence between her and D.B. J.A. sought a temporary protection order after D.B. hit her and sprayed her with mace, but she did not feel a permanent order was necessary. CPS later closed its investigation.

The family moved to Arizona, where B.D.B. was born in 2019. CPS in Arizona became involved around the time of B.D.B.'s birth because J.A. relapsed on methamphetamine. CPS implemented a family safety plan, which required J.A., D.G.B., and B.D.B. to stay with J.A.'s sister under 24-hour supervision. J.A. later moved into a shelter in Phoenix where she received substance abuse treatment, counseling, and she attended weekly Alcoholics Anonymous and Narcotics Anonymous meetings.

In February 2020, the family returned to Yakima. J.A. continued to use methamphetamine. At one point, she contacted law enforcement because she believed D.B. had taken her children. In retaliation, D.B. hit J.A. in the face. D.B. reported he hit J.A. because of her drug use. Law enforcement arrested D.B. and recommended that J.A. move into the YWCA in Yakima, a domestic violence shelter for women. J.A. stayed at the YWCA with her children for one week but was asked to leave because she screamed profanities at her children.

*Procedure*

*1. Dependency petitions*

Julie Scott, a CPS investigator, was assigned the case after receiving reports of physical abuse and neglect from the YWCA and a local Rite Aid store employee. In March 2020, Ms. Scott filed dependency petitions[1] on behalf of the Department for both D.G.B. and B.D.B. The court ordered the State to take both children into custody and place them in shelter care. The children were found in a motel a couple of days later.

After the children were taken into custody, Ms. Scott set up a Family Team Decision Making Meeting with J.A. to address her concerns. J.A. attended the meeting,

---

[1] Neither party designated the dependency petitions with the clerk's papers nor were they designated as exhibits.

where she and Ms. Scott discussed what services the Department offered, including a mental health assessment, a drug and alcohol assessment, and random urinalysis testing. J.A. declined Ms. Scott's offer of those services citing a recent surgery.

Around that time, J.A. moved to Kennewick to live with her mother while she recovered from surgery. She stayed there for about one month. During that time, J.A.'s case was transferred from Ms. Scott to social worker Kimberly Hawkins.

Ms. Hawkins discussed with J.A. what services were offered and referred her to Merit Resource Services, a facility in Kennewick, for substance use disorder assessments and urinalysis testing. Ms. Hawkins also discussed a mental health assessment referral to Catholic Charities in Kennewick. She explained those services would be paid for by Medicaid and provided J.A. the phone number to call to obtain insurance, which J.A. successfully obtained.

As promised, Ms. Hawkins sent referrals to Merit Resource Services in Kennewick on March 17 and April 30, 2020. Ms. Hawkins texted J.A. after she sent the first referral to Merit. J.A. attended her initial substance abuse assessment but never returned for her results. J.A. provided one urinalysis sample on Ms. Hawkins's initial referral, the only sample she submitted throughout the pendency of the dependencies.

4

In April, J.A. returned to Yakima. That month, she admitted herself into a detox facility at Comprehensive Healthcare in Yakima. While there, Leslie Pace, a mental health counselor, conducted an outpatient mental health assessment on J.A. Ms. Pace diagnosed J.A. with posttraumatic stress disorder, severe methamphetamine use, and severe cannabis use disorder. Three days later, J.A. completed a drug and alcohol assessment with Joseph Zambrano at Comprehensive.

Ms. Pace recommended J.A. attend outpatient dual diagnosis mental health treatment and therapy for substance use provided by Comprehensive. The purpose of a dual diagnosis program is to treat both mental health and substance use disorder simultaneously.

J.A. e-mailed Ms. Hawkins to let her know about her assessments and the results from Comprehensive. She informed Ms. Hawkins that she was recommended outpatient dual diagnosis treatment and requested another referral to Merit Resource Services to restart random urinalysis testing. Ms. Hawkins responded to J.A. by e-mail and clarified that the previous urinalysis referral was for Merit in Kennewick but stated that she would send an updated referral to Merit in Yakima. The record is unclear if J.A. responded to this e-mail. J.A. was scheduled to begin treatment at Comprehensive following her referral, but she never attended the appointment.

In May, Ms. Hawkins met with both J.A. and D.B. in person to discuss treatment services. D.B. was able to secure a bed date for inpatient substance use treatment in Wenatchee, but J.A. wanted to stay in Yakima to obtain substance use disorder services and to look for a job and housing. Ms. Hawkins provided them with gas cards to assist with transportation to service appointments and provided information on local shelters and housing agencies with contact information. Ms. Hawkins also provided a mobile phone to J.A. to use to access services and remote visitation.

Later that month, D.B. was shot to death in J.A.'s presence. J.A. began using fentanyl following D.B.'s death.

### 2. *Dependency orders*

On May 27, 2020, J.A. stipulated that both D.G.B. and B.D.B. were dependent, and the court issued dependency orders that day. The court ordered J.A. to participate in random urinalysis testing, substance use disorder treatment, a mental health assessment, a parenting assessment, domestic violence services, and to follow any recommended treatment. The court also ordered J.A. to sign releases of information with all service providers and to maintain contact with the Department. The court noted in the orders that "[t]he mother reports that she has a recent treatment recommendation from

Comprehensive Health Care to participate in Intensive Outpatient Treatment." Ex. 3

(D.G.B.), at 3; Ex. 10 (B.D.B), at 3.

The court also explained that J.A. agreed to the facts that formed the basis of the

dependencies. She acknowledged her long history of substance abuse and that she lost

her parental rights to her other three children for failure to complete court-ordered

substance abuse treatment. She also acknowledged that domestic violence occurred in

front of her children and agreed that she needed to participate in services for parenting

and substance abuse in order to safely parent her children.

In June, J.A. e-mailed Ms. Hawkins requesting a referral to inpatient substance use

treatment at Sundown M Ranch in Yakima. Ms. Hawkins responded, explaining that no

referral was necessary and J.A. needed only to schedule an assessment at Sundown. Ms.

Hawkins provided J.A. with Sundown's telephone number and informed her that it is not

a dual diagnosis facility but that there are some inpatient dual diagnosis facilities outside

of Yakima. Ms. Hawkins asked J.A. if she was still interested in dual diagnosis treatment

and provided contact information for two inpatient dual diagnosis facilities: Inland

Northwest Behavioral Health in Spokane and Cascade Behavioral Health in Tukwila.

Ms. Hawkins also suggested J.A. could get an assessment at Triumph Treatment Services,

a local substance use treatment facility in Yakima and that a Triumph assessment could be used to get her into an inpatient dual diagnosis facility.

In this e-mail exchange, Ms. Hawkins and J.A. also discussed switching J.A.'s health insurance to Apple Healthcare, an insurance provided by Washington State. Ms. Hawkins directed J.A. to call and switch her insurance so that she could set up an appointment at Sundown and provided her a phone number to do so. J.A. complied and informed Ms. Hawkins that she was able to switch her insurance and set up an appointment at Sundown. Later, Ms. Hawkins attempted to confirm how the assessment went and what J.A.'s plans were for inpatient treatment, but J.A. did not respond to Ms. Hawkins's questions. J.A.'s only response to Ms. Hawkins was a request for a new food stamp card.

J.A. attended inpatient substance use treatment at Sundown but left after three days, without completing treatment. After J.A. left Sundown, she sporadically contacted Ms. Hawkins, who encouraged her to get into inpatient treatment.

In July, J.A. texted Ms. Hawkins that she was unsafe and wanted to see her children one last time. Ms. Hawkins encouraged J.A. to go to detox or an inpatient facility.

In August, Ms. Hawkins again spoke with J.A. to inform her that her children's placement was changed and that they were living with J.A.'s sister in Kennewick. J.A.'s sister brought the children to Yakima for an in-person visit with J.A. That month, Ms. Hawkins texted J.A. about preferred treatment providers and referred her for a domestic violence evaluation and random urinalysis testing at Triumph in Yakima. Ms. Hawkins and J.A. also discussed engaging in substance use disorder treatment at Comprehensive Healthcare because her previous assessment was still active there.

On September 8, Ms. Hawkins and J.A. again spoke about setting up visitation. Ms. Hawkins offered bus tickets for J.A. to travel to Kennewick and visit her children and sister, but J.A. declined and said she had a ride.

After that conversation through April 2021, Ms. Hawkins lost all contact with J.A. During that time period, J.A. had no visits with her children, made no contact with Ms. Hawkins or the Department, and did not engage in any court-ordered services. During that time period, per Department policy, Ms. Hawkins checked the jail roster weekly for J.A.'s name and sent her letters, calls, texts, and e-mails, to no avail.

*3. Termination petitions*

In November 2020, the Department petitioned the court to terminate J.A.'s parental rights to D.G.B. and B.D.B. The court appointed a guardian ad litem for the

children and set a termination hearing for March 2021. The court granted a Department motion to publish the notice and summons because Ms. Hawkins was unable to locate J.A. After J.A. failed to appear at the termination hearing, the court entered an order of default and set a presentment hearing for the termination orders for April 2021.

J.A. appeared at the presentment hearing and the court appointed her an attorney. Although J.A. remained in default, the court set a status hearing to overturn the default for later that month. At the status hearing, the court overturned J.A.'s default and set a termination trial date for September 27-28, 2021, in addition to setting dates for triage and status hearings. That month, Ms. Hawkins sent J.A. referrals for counseling and a domestic violence evaluation.

In May 2021, Ms. Hawkins held another Family Team Decision Making Meeting via zoom with J.A. Ms. Hawkins informed J.A. that her children were moved into a licensed foster care facility. Ms. Hawkins again discussed the substance use, mental health, and domestic violence services offered to J.A.

In June, J.A. again admitted herself into the detox facility at Comprehensive. She stayed in the facility for just one day and then left. Ms. Hawkins referred J.A. for a visit with her children later that month, which J.A. attended.

In July, Ms. Hawkins sent J.A. a service letter reminding her of the court-ordered services, the contact information for treatment providers, and where she had active referrals. With regard to substance use treatment, the letter informed J.A. that she needed to complete a chemical dependency evaluation. The letter also informed J.A. of the upcoming termination trial. Ms. Hawkins also sent J.A. referrals to counseling, a parenting assessment, and random urinalysis testing.

In August, J.A. texted Ms. Hawkins and reported that she went to a facility to attempt to get a prescription for Suboxone. Ms. Hawkins informed J.A. that she still needed to complete substance use treatment and that Suboxone would not work for treating methamphetamine.

At the beginning of September, Ms. Hawkins again texted J.A. to remind her about offered services. Ms. Hawkins sent J.A. a referral to Triumph for random urinalysis testing. Later that month, at the triage hearing, J.A. asked about dual diagnosis treatment. Following the hearing, Ms. Hawkins texted J.A. and recommended Evergreen Treatment Services, an inpatient dual diagnosis treatment facility in Seattle. Ms. Hawkins again informed J.A. that she did not need a referral and instead only needed to complete a new substance use disorder assessment. Ms. Hawkins provided J.A. with a list of providers, and J.A. ultimately choose to go to Barth Clinic for the assessment.

4. *Termination trial*

The termination trial was held on September 27, 2021. The State called J.A. to testify. J.A. testified consistently with the facts above. J.A. testified that she started using marijuana and methamphetamine at the age of 13. She explained that she had attempted to complete multiple treatment programs, including several inpatient treatment programs. Her longest period of sobriety occurred in 2011 and lasted between six and nine months, when she attended inpatient treatment at Riel House. She acknowledged that she was supposed to continue outpatient treatment after she completed treatment at Riel House but stated that she did not complete it. She returned to Riel House for treatment in 2016 but left after one week because the program had changed and was "too relaxed." 1 Rep. of Proc. (RP) (Sept. 27, 2021) at 35. J.A. testified she was using methamphetamine two times per week and four fentanyl pills per day at that time.

The State's attorney asked J.A. if her social worker had ever talked with her about dual diagnosis programs. J.A. responded that the social worker "didn't offer no services. I didn't know that those services were, you know, really available. I thought that I just had to do the drug and alcohol assessment." 1 RP (Sept. 27, 2021) at 43. The State's attorney then asked J.A. about her admission into the detox facility at Comprehensive and whether J.A. received a recommendation for treatment following her substance use

assessment. J.A. responded, "I believe I did and it was dual diagnosis. And nobody has given me any information on facilities available or approved." 1 RP (Sept. 27, 2021) at 44.

Following J.A.'s testimony, the court recessed the trial. When trial resumed, J.A.'s attorney informed the court that J.A. expressed interest in relinquishing her parental rights to both D.G.B. and B.D.B. and had signed the required documents. The court accepted the relinquishments and found that J.A. made a knowing, intelligent, and voluntary decision to terminate her parental rights. The court adjourned the termination trial and set a hearing on the relinquishments.

Two days later, J.A. chose to revoke her relinquishments, and the court set the resumption of the termination trial for November 29 and 30, 2021.

Prior to the new trial date, J.A. attended a substance use assessment at Barth Clinic, where she met with Yuridia Servin, a substance disorder professional. J.A. told Ms. Servin that she was using 10 pills of fentanyl, methamphetamine, and marijuana daily. Following her assessment, Ms. Servin diagnosed J.A. with opioid, methamphetamine, and cannabis use disorder. Ms. Servin recommended a high intensity, dual diagnosis inpatient treatment program at Evergreen Recovery Center. The

13

evaluation report indicated that J.A. was working with Barth to set up a bed date for inpatient treatment.

On November 3, 2021, J.A. was arrested on an outstanding warrant. While in jail, she attempted to commit suicide and was prescribed mental health medication. On November 15, Ms. Servin went to the jail to supplement Barth's substance use disorder assessment of J.A., which was necessary every two weeks in order to obtain inpatient treatment. The following day, November 16, J.A. was released from jail and returned to Barth. Ms. Servin informed J.A. that she needed to make daily contact with the clinic in order to secure a bed date for inpatient treatment. However, J.A. failed to maintain daily contact and, as a result, failed to obtain a bed date for treatment.

The termination trial resumed on November 29, 2021. During trial, the State called various witnesses relevant to J.A.'s case including law enforcement, treatment providers, social workers, and the children's guardian ad litem. We limit our discussion to those witnesses necessary to resolve the issue on appeal.

The State called J.A. to testify again. J.A. acknowledged that Ms. Hawkins provided her the contact information for two inpatient dual diagnosis facilities. The State's attorney then questioned J.A.:

> Q      Ms. Hawkins has explained to you on several occasions that you need to do a drug and alcohol assessment to access inpatient treatment, correct?
> A      Oh, correct.
> . . . .
> Q      Okay.  So, it's accurate that you understand that the assessment is the first piece of getting into a dual diagnosis program? That's accurate?
> A      Yes . . . —

2 RP (Nov. 29, 2021) at 32.

Ms. Scott testified that she decided to file the dependency petitions and requested pickup orders based on the reports of domestic violence, drug use, and of J.A. being unable to feed her children.  Ms. Scott testified that she discussed and offered J.A. mental health, substance use, and parenting assessments, as well as random urinalysis testing, but that J.A. declined those services because of a medical condition.

Ms. Pace testified that she performed a mental health assessment of J.A. in April 2020 at Comprehensive.  She recommended J.A. engage in outpatient mental health treatment and therapy for substance use, and Ms. Pace made a referral for a substance use disorder assessment.  Ms. Pace testified that J.A. was scheduled for a therapy appointment later that month but that she failed to show up.

Kimberly Clemmons, the team leader of the detox facility at Comprehensive, testified that the facility provides a monitored environment for individuals to withdraw

off substances. She testified that if a patient wants a substance use disorder assessment, Comprehensive can provide and schedule the service or will refer the patient to outside agencies, if desired. She testified that J.A. admitted herself into the detox facility in June 2021 and stayed only one day without participating in a substance use assessment.

Ms. Hawkins testified consistent with the facts above. When asked about J.A.'s parental deficiencies, Ms. Hawkins stated that she has "very high drug and alcohol concerns" and that "mental health is still an issue." 2 RP (Nov. 30, 2021) at 216. Ms. Hawkins stated that she did not believe J.A. could correct her deficiencies in the near future because she "has not consistently engaged in any services." 2 RP (Nov. 30, 2021) at 217.

Following trial, the court entered a letter decision explaining its decision to terminate J.A.'s parental rights to both D.G.B. and B.D.B. Six months later, the court entered the termination orders for each child, which contained its formal findings and conclusions. Specifically, the court concluded the Department showed by clear, cogent, and convincing evidence that the services ordered and all services that were necessary, reasonably available, and capable of correcting the parental deficiencies were expressly and understandably offered or provided. The court made the following conclusions that are challenged on appeal:

16

3.1.4   Substance use disorder [SUD] services and mental health services were discussed with [J.A.] on several occasions during the shelter care period and during the dependency. These conversations were done in person, telephonically, by text message, and by emails that are exhibits in this trial. DCYF [Department of Children, Youth, and Families] made reasonable efforts to engage [J.A.] in these services on many occasions. SUD and mental health services were available and remain available to [J.A.] in the form of out-patient dual diagnosis treatment here in the Yakima Valley, and through in-patient services in both Eastern and Western Washington. [J.A.] was aware of the services and her awareness of them is set forth in her email conversations with her social worker, Kimberly Hawkins, in email exchanges in April of 2020 and June of 2020. [J.A.] has also expressed understanding of her service[s] to Ms. Hawkins in person, via text message and telephone conversations.

3.2.4   The court does not find that a psychological evaluation of [J.A.] is or was a necessary service. This service may have become useful if she engaged in services and had difficulty understanding or retaining the information. The court finds that if [J.A.] had participated in SUD and mental health services, she would have been able to remedy those parental deficiencies. The court finds that if she had become sober and addressed her mental health diagnosis with medicine management and therapy, she could have successfully engaged in parenting education and domestic violence services and been able to remedy those parental deficiencies. But the fact is that [J.A.] did not attend a single mental health therapy session. She did not engage in medicine management until after her November 2021 suicide attempt in the Yakima County Jail. [J.A.] attended SUD assessments, but she never followed a single recommendation. She did not successfully complete in-patient SUD services. She did not attend a single outpatient dual diagnosis treatment session.

CP at 182 (D.G.B.); CP at 407 (B.D.B.).

J.A. timely appeals.

ANALYSIS

WERE ALL REASONABLY AVAILABLE SERVICES OFFERED OR PROVIDED?

J.A. assigns error to the orders of termination and the conclusions of law quoted above, but does not challenge a specific finding of fact. Appellant's Opening Br. at 2. She contends the court never ordered, and the Department failed to offer or provide, all necessary services capable of correcting parental deficiencies, specifically, inpatient dual diagnosis treatment. We disagree.[2]

---

[2] J.A. assigns error to conclusion of law 3.2.4, quoted above. Although her statement of the case mentions that Ms. Hawkins did not refer her to a psychological assessment, no portion of the argument section in her brief addresses this issue. We decline to address this issue because it is not supported by argument. *Valley View Indus. Park v. City of Redmond*, 107 Wn.2d 621, 630, 733 P.2d 182 (1987) (A party abandons an assignment of error if it fails to argue it in its brief.).

Similarly, J.A.'s opening brief includes three discrete issues pertaining to her assignments of error. Appellant's Opening Br. at 2-3. Her first two issues concern whether the Department offered or provided referrals for J.A. to obtain a Suboxone prescription and domestic violence treatment. *Id*. However, J.A. does not discuss or provide any argument on these two issues. *See id*. at 13-23. Instead, the entire argument section in her brief is devoted to the third issue: whether the court and Department offered and provided inpatient dual diagnosis treatment. *Id*. We decline to address the first two issues. An appellant must provide "argument in support of the issues presented for review, together with citations to legal authority and references to relevant parts of the record." RAP 10.3(a)(6).

*Standard of review*

"Parents have a fundamental liberty interest in the care, custody, and management

of their children." *In re Welfare of D.E.*, 196 Wn.2d 92, 102, 469 P.3d 1163 (2020)

(citing *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982)

(plurality opinion)).  To deprive a parent of this fundamental right is a two-step process.

*In re Welfare of A.B.*, 168 Wn.2d 908, 911, 232 P.3d 1104 (2010).  First, the Department

must prove the six termination factors set forth in RCW 13.34.180(1) by clear, cogent,

and convincing evidence.  *Id.*  If that is satisfied, the court then determines whether by a

preponderance of the evidence, termination is in the best interests of the child.  *In re*

*Dependency of K.N.J.*, 171 Wn.2d 568, 576-77, 257 P.3d 522 (2011).  Given the vital

interests at stake, the Department bears the burden of proof at termination trials.  *In re*

*Parental Rights to M.A.S.C.*, 197 Wn.2d 685, 698, 486 P.3d 886 (2021).  We afford the

trial court great deference on review.  *In re Dependency of K.S.C.*, 137 Wn.2d 918, 925,

976 P.2d 113 (1999).  Unchallenged findings of fact are verities on appeal.  *In re*

*Dependency of M.S.R.*, 174 Wn.2d 1, 9, 271 P.3d 234 (2012).

This court reviews a trial court's decision on any of the six termination factors for

substantial evidence.  *In re Parental Rights to B.P.*, 186 Wn.2d 292, 313, 376 P.3d 350

(2016).  The trial court's findings "must be upheld if supported by substantial evidence

from which a rational trier of fact could find the necessary facts by clear, cogent, and convincing evidence." *In re Welfare of M.R.H.*, 145 Wn. App. 10, 24, 188 P.3d 510 (2008). Clear, cogent, and convincing evidence means "highly probable." *Id.* The reviewing court does not decide the credibility of witnesses or weigh the evidence. *In re Dependency of A.V.D.*, 62 Wn. App. 562, 568, 815 P.2d 277 (1991).

    *All necessary services were offered or provided*

  J.A. challenges the trial court's conclusion on the fourth termination factor, which requires the Department to prove that "all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided." RCW 13.34.180(1)(d). A "necessary service" is one that "'address[es] a condition that precludes reunification of the parent and child,'" often including mental health treatment, substance use treatment, and relevant educational programming. *In re Parental Rights to K.M.M.*, 186 Wn.2d 466, 480, 379 P.3d 75 (2016) (quoting *In re Dependency of A.M.M.*, 182 Wn. App. 776, 793, 332 P.3d 500 (2014)).

  The Department must tailor its offered services to the individual, requiring it to identify a parent's specific needs and provide services accordingly. *In re Parental Rights to I.M.-M.*, 196 Wn. App. 914, 921, 385 P.3d 268 (2016). For example, when a parent

has both mental health and chemical dependency needs, the Department must provide

integrated services. *Id.* at 922.

A parent's persistent refusal to participate in a service can satisfy the Department's

obligation under RCW 13.34.180(1)(d). *M.R.H.*, 145 Wn. App. at 26. The Department

has offered all reasonable services when the record establishes that the further offer of

services would be futile. *K.M.M.*, 186 Wn.2d at 483. The provision of services is futile

when a parent is unwilling or unable to benefit from an offered service within a

foreseeable time. *Id.*

J.A. first argues she needed inpatient dual diagnosis treatment but that the court

never ordered this service. This argument is without merit.

After J.A. stipulated to the dependencies of her children, and following each of the

four dependency review hearings, the court explicitly ordered her to participate in

substance use and mental health assessments and to follow any recommended treatments.

Once Barth Clinic recommended J.A. attend inpatient dual diagnosis treatment for her

substance use disorders and mental health, it became a court-ordered treatment.

J.A. next argues the Department failed to offer or provide inpatient dual diagnosis

treatment for her substance use disorder and mental health. J.A. cites *I.M.-M.* to support

her argument. There, we reversed an order of termination after concluding that the

evidence did not support the finding that all necessary services were offered. 196 Wn. App. at 921-22. The Department was aware the mother in *I.M.-M.* had cognitive impairments and chemical dependency needs, necessitating integrated services. *Id*. at 922. Despite this, the Department did not offer the mother integrated services. *Id*.

*I.M.-M.* is distinguishable from the facts here. First, no evaluation of J.A. indicated she had cognitive deficiencies that would affect her ability to understand the services offered to her. Second, as we discuss below, it is undisputed that the Department offered inpatient dual diagnosis treatment to J.A., in addition to other forms of treatment. Both Ms. Hawkins and J.A. testified to this fact and exhibits support their testimonies.

The trial court specifically found that Ms. Hawkins provided J.A. with information about Sundown M Ranch, an inpatient, nondual diagnosis treatment facility, and information about two inpatient dual diagnosis facilities:

> 2.3.30 Between June 8, 2020, and June 15, 2020 [J.A.] and [Ms.] Hawkins discussed inpatient treatment through email. [J.A.] stated a desire to enter inpatient treatment at Sundown M Ranch and had some questions about a referral to this program. Ms. Hawkins explained that a referral was not needed since health insurance will pay for this service and that all she needed to do is contact Sundown M Ranch to schedule an assessment and she provided [J.A.] their toll-free telephone number.
>
> 2.3.31 Ms. Hawkins also informed [J.A.] that Sundown M Ranch is not a dual diagnosis facility and that there are some on the Westside of the state. She asked if [J.A.] was still interested in going to a dual

diagnosis facility.  [J.A.] asked if Ms. Hawkins was unable to find any dual diagnosis facilities near here—meaning Yakima Washington as that is where [J.A.] was residing.  Ms. Hawkins replied by email with two in-patient dual diagnosis facilities that she was aware of: Inland Northwest Behavioral Health in Spokane and Cascade Behavioral Health in Tukwilla, Washington.  She provided the telephone number for each of these facilities in her email of June 10, 2020.  Ms. Hawkins also suggested [J.A.] could get an assessment at Triumph and they would assist her with getting into an in-patient dual diagnosis facility.

CP at 177 (D.G.B); CP at 402 (B.D.B.).  Although these unchallenged findings are verities on appeal, they are also supported by substantial evidence.  Ms. Hawkins's e-mails to and from J.A. are evidenced by photocopies of the e-mail exchanges.  Ms. Hawkins testified consistent with the court's findings.  And J.A. testified that Ms. Hawkins discussed the inpatient dual diagnosis programs at Inland Northwest Behavioral Health and Cascade Behavioral Health and that she was willing to travel to attend such a facility.  J.A. also acknowledged that Ms. Hawkins gave her the phone numbers and instructions on how to contact the two inpatient dual diagnosis facilities.

The trial court found that J.A. instead chose to enter treatment at Sundown, which was not dual diagnosis treatment and that she left the facility without completing treatment.  Substantial evidence supports these findings, including J.A.'s and Ms. Hawkins's testimonies at trial.

23

The trial court also found that, prior to the resumption of the termination trial, J.A. attended a substance use disorder assessment at Barth Clinic and had been offered inpatient treatment. The court found:

> 2.3.18 . . . Barth identified three substance use disorders, amphetamine-type use, opioid use, and cannabis use disorders, all severe. Their recommended treatment was Level III.V, clinically managed high-intensity residential services. They indicated that [J.A.] was in the process of obtaining a bed date to begin those inpatient services. As of November 30, 2021, [J.A] had not entered into inpatient treatment.

CP at 176 (D.G.B.); CP at 401 (B.D.B.). Again, although these unchallenged findings are verities, they are supported by substantial evidence. The diagnosis and recommendation are evidenced by a letter from Barth's clinical director and Ms. Servin to J.A.'s attorney. Ms. Servin also testified that Barth recommended inpatient dual diagnosis treatment and that she informed J.A. she needed to make daily contact with the clinic to set up a bed date for inpatient treatment once she was released from jail. Ms. Servin testified that J.A. failed to make daily contact and, as a result, failed to obtain a bed date for treatment.

These examples of treatment being recommended and J.A. failing to follow through on recommendations support the trial court findings that:

> 2.3.57 Throughout the case Ms. Hawkins has recommended both substance use disorder treatment and mental health treatment and she has discussed these services with [J.A.]. Ms. Hawkins stated that these two services are critical for [J.A.] to be able to safely parent her

24

children.  It is also clear from her testimony that this can be done through both inpatient and outpatient dual diagnosis treatment or by simultaneously engaging in SUD treatment with one provider and mental health services through another provider, as long as the parent signs the appropriate releases of information so the providers can communicate effectively while delivering these services.

2.3.58 Based on [J.A.]'s inability to complete all recommended phases of her SUD treatment in her prior dependencies, and her inability or unwillingness to engage in SUD treatment during the twenty-one months of this dependency case, Ms. Hawkins believes it is very unlikely that [J.A.] will be able to remedy this parental deficiency in the near future.  [J.A.] has a history of stating she wants to get into treatment, or she takes the initial steps of the SUD assessments, but then fails to follow through on those recommendations.

CP at 180 (D.G.B.); CP at 405 (B.D.B.).  Substantial evidence supports these findings, and they support the trial court's conclusion the Department met its burden to prove by clear, cogent, and convincing evidence that it offered or provided all necessary services, reasonably available, capable of correcting the parental deficiencies.

Also, Ms. Scott testified she first discussed substance use and mental health assessments and services with J.A. in March 2020, when the dependencies were filed, but that J.A. declined the services.  At the shelter care hearing, Ms. Scott again offered services to J.A.

In addition, Ms. Hawkins testified that she discussed and referred J.A. to substance use disorder and mental health assessments in March and April 2020. She explained that J.A. attended the initial substance use assessment but failed to return for her results.

Ms. Hawkins testified about her e-mail with J.A. about inpatient treatment at Sundown and the two options for inpatient dual diagnosis treatment. Ms. Hawkins testified that she met with J.A. and discussed referrals to court-ordered treatment, including substance use disorder treatment again in August 2020. But, after J.A. visited with her children on September 8, 2020, Ms. Hawkins had no communication with her until April 2021. During this time, per Department policy, Ms. Hawkins checked the jail roster weekly for J.A.'s name and sent J.A. letters, calls, texts, and e-mails, to no avail. There is no evidence that J.A. engaged in any court-ordered treatment during this time period.

After the extended period without contact, Ms. Hawkins testified that she again discussed substance use disorder and mental health services at a June 2021 meeting attended by J.A. And prior to the termination trial in September 2021, Ms. Hawkins again discussed dual diagnosis treatment with J.A. after she asked the court about a dual diagnosis program during a pretrial hearing. Ms. Hawkins texted J.A. after she left the

courtroom to inform her about another inpatient treatment provider, Evergreen Treatment Services, and how to access treatment there.

Ms. Hawkins testified that she again discussed dual diagnosis treatment at Evergreen with J.A. again after the first termination trial date in September 2021. She informed J.A. that she did not need a referral for the treatment but that she needed to complete a new substance use disorder assessment. Ms. Hawkins provided J.A. with names of places to get the assessment, and J.A. chose to go to Barth.

Further, Ms. Servin testified that she conducted substance use disorder assessments of J.A. twice and that she recommended high intensity, dual diagnosis inpatient treatment. Ms. Servin informed J.A. that she needed to keep in daily contact with the clinic to secure an inpatient treatment bed date but confirmed that J.A. failed to make daily contact with the clinic.

We conclude that substantial evidence supports the trial court's decision that the Department met its burden to prove it offered or provided all necessary services, reasonably available, capable of correcting J.A.'s parental deficiencies, including inpatient dual diagnosis treatment.

No. 38924-3-III; No. 38925-1-III
*Parental Rights to D.G.B. and B.D.B*

Affirmed.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_____
Lawrence-Berrey, J.

WE CONCUR:

_____          _____
Fearing, C.J.                                                     Staab, J.